IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEVELOPMENTAL SERVICES OF NEBRASKA, | ) ) ) | 4:04CV3272 |
| Plaintiff, | ) ) | **MEMORANDUM AND ORDER** |
| vs. | ) ) | |
| CITY OF LINCOLN, and DENNIS HOHBEIN, as Fire Marshal of the State of Nebraska, in his official capacity only, | ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on a motion for summary judgment filed by one of the defendants, the City of Lincoln, Nebraska. The motion will be granted in part and denied in part.

## INTRODUCTION

The plaintiff, Developmental Services of Nebraska ("DSN") is a nonprofit, charitable corporation that provides residential treatment to children and adults with developmental disabilities. It has sued the City of Lincoln and the State Fire Marshal for their refusal to issue certificates of occupancy for residences that failed to meet fire safety requirements of Chapter 23 of the 1994 Life Safety Code ("Existing Residential Board and Care Occupancies"), published by the National Fire Protection Association. DSN also challenges the City's reclassification of three of the properties as group homes, and claims that the City's zoning ordinances and land use regulations violate the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. §§ 3601-3619, Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12165, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

The City has moved for summary judgment[1] and argues: (1) that DSN's "reasonable accommodation" claim regarding the Lincoln Municipal Code zoning regulations ("Zoning Ordinance") is not ripe for adjudication; (2) that the disputed provisions of the Zoning Ordinance are not facially discriminatory, or, in the alternative, are rationally related to a legitimate governmental interest; (3) that DSN cannot simultaneously allege "disparate treatment" and "disparate impact" in challenging the Zoning Ordinance; (4) that, even assuming the Zoning Ordinance has a disparate impact on disabled persons, it is rationally related to a legitimate governmental interest; and (5) that DSN's claim under 42 U.S.C. § 3617 for interference with its rights under the FHAA is coextensive with its "disparate treatment" and "disparate impact" claims, and, in any event, fails because the City provided legitimate, nondiscriminatory reasons for its conduct.  The City does not argue that it is entitled to summary judgment on any claims made against it regarding the Life Safety Code.[2]  Thus, to the extent that the City's motion might otherwise

---

[1] The State Fire Marshal earlier filed a motion to dismiss, claiming Eleventh Amendment immunity as to all claims and also asserting that DSN's "reasonable accommodation" claim seeking an exemption from the Life Safety Code provisions was "completely asinine."  I denied the motion except insofar as DSN was seeking to recover damages under the FHAA or the ADA.

[2] For example, in describing the nature of the case, the City makes no mention of the Life Safety Code.  It states:

> This is an action brought by DSN against the City for discrimination under the Fair Housing Act, Americans With Disabilities Act, and the Rehabilitation Act alleging that the City's Zoning Ordinance on its face treats people with disabilities different from other people.  DSN also alleges that if the Zoning Ordinance is neutral, it has a disparate impact on a person because of his/her disability.  Finally, DSN alleges that the City has discriminated against DSN by failing to grant DSN a reasonable accommodation from the Zoning Ordinance spacing requirement between group homes or from the City's definition of family which only allows three unrelated persons to reside together.

2

encompass such claims, they will deemed to involve genuine issues of material fact.[3] See NECivR 7.1 (the supporting brief must "state concisely the reasons for the motion," and "a party who fails to observe the requirements of this rule may be deemed to have abandoned in whole or in part that party's position on the pending motion.").

### Statement of Facts

Pursuant to NECivR 56.1, the parties are in agreement that the following material facts may be accepted as true for purposes of the pending motion:

> 1. DSN is a non-profit charitable 501(c)(3) corporation. DSN is organized under the laws of the State of Nebraska with a principle [sic] place of business in Lincoln, Nebraska. DSN provides residential treatment to persons, both children and adults, with developmental disabilities, mental illness, and behavioral challenges to help them gain the skills, knowledge, and experience to increasingly use and benefit

(Defendant's Brief (filing 29), pp. 1-2.) The City's only reference to the Life Safety Code in its argument is as follows:

> [T]he City has stated that the State Fire Marshal's Life Safety Code precluded the operation of DSN's homes as requested without meeting enhanced fire safety requirements. . . . The City advised DSN that the certificates of occupancy were not issued because DSN was requesting action from the City of Lincoln which it could not grant with respect to waivers of the State Fire Marshal's Life Safety Code provisions. The City specifically advised DSN to request a reasonable accommodation from the Life Safety Code through the State Fire Marshal's Office which DSN did.

(Id., at 21-22.)

_____

[3] DSN's brief, however, also fails to discuss its various claims against the City regarding the Life Safety Code. If DSN intends to pursue such claims only against the State Fire Marshal, it should promptly advise the court of this fact.

3

from the resources and settings available to all citizens in Lincoln, Nebraska. DSN currently operates approximately fourteen homes in the City of Lincoln for people with developmental disabilities.

2. Defendant City of Lincoln, Nebraska ("City") is a municipal corporation organized and existing pursuant to laws of the State of Nebraska.

3. The City Council, pursuant to the Lincoln City Charter Article IXB §§ 8 and 9, is responsible for enacting the City's Zoning Ordinance and the City Council is further authorized to amend, supplement, or otherwise modify the Zoning Ordinance. Pursuant to Lincoln Municipal Code § 27.81.040, the City Council has authorized persons to petition the City Council to amend, supplement, or modify the Zoning Ordinance.[4]

4. DSN may only lawfully operate its homes with four or more residents with developmental disabilities by obtaining a certificate of occupancy for a group home (four to fifteen persons), or a health care facility (16 or more persons) from the City and by obtaining a license as a center for the developmentally disabled (CDD) from the Nebraska

---

[4] Lincoln Municipal Code § 27.81.040 provides, in part:

The City Council may from time to time on its own motion, or on petition, amend, supplement, or otherwise modify this title. Any such proposed amendment, supplement, or modification shall first be submitted to the Planning Commission for its recommendations and report. Said report shall contain the findings of the commission regarding the effect of the proposed amendment, supplement, or modification upon adjacent property and upon the Comprehensive Plan of the City of Lincoln. After the recommendations and report of the Planning Commission have been filed, the City Council shall, before enacting any proposed amendment, supplement, or modification hold a public hearing in relation thereto, giving notice of the time and place of such hearing as provided in Section 27.81.050 hereafter.

(Plaintiff's Brief (filing 38), pp. 3-4, ¶ 3; Filing 30, p.22.)

Department of Health and Human Services Regulation and Licensure (HHS) pursuant to the Health Care Facility Licensure Act.

5. On or about November 28, 2003, DSN, through its attorney Lisa Koch ("Koch"), requested the City to apply the fire safety requirements for a single-family dwelling to three proposed group homes operated by DSN.

6. On or about December 9, 2003, the City through its attorney Ernest R. Peo ("Peo") . . . [responded to Koch's request].[5]

7. On or about December 15, 2003, Koch . . . [wrote Peo again].[6]

---

[5] As summarized by the City,

Peo . . . advised Koch that the City did not have authority to grant the requested reasonable accommodation and that the request should be pursued through the State Fire Marshal. Specifically, Peo advised Koch that since the request for reasonable accommodation was associated with DSN's application for licensure by the Nebraska Department of Health and Human Services, the fire inspections performed by the City of Lincoln's Bureau of Fire Prevention were for the purpose of verifying that the facilities complied with the State Fire Marshal's Life Safety Code rather than any specific Lincoln Municipal Code. Specifically, Peo advised Koch that although the City of Lincoln's Bureau of Fire Prevention conducts inspections for the Department of Health and Human Services to verify that facilities comply with the State Fire Marshal's Life Safety Code, the City only conducts those inspections under its delegated authority from the State Fire Marshal pursuant to Neb. Rev. Stat. § 81-502(1)(c)(iii).

(Defendant's Brief, p. 3, ¶6.) DSN disputes these statements "to the extent they are inconsistent with the letter from Rick Peo . . . to DSN cited therein." (Plaintiff's Brief, p. 4, ¶ 6.) The letter appears in the record at filing 30, pp. 46-47.

[6] According to the City,

Koch advised Peo that the City misunderstood DSN's request for

5

8. In response, Peo on or about December 31, 2003, . . . [wrote another letter to Koch.][7]

9. On or about February 10, 2004, DSN requested the City to grant DSN a reasonable accommodation from the City's Zoning Ordinance requirement that DSN's group homes at 4000 Lindsey Circle and 2440 S.W. 18th Street be separated from another group home by one-half mile as each of those two homes were located less than one-half

_____

reasonable accommodation. Koch advised Peo that DSN was requesting reasonable accommodation to § 27.03.220 of the Lincoln Municipal Code (i.e., definition of family).

(Defendant's Brief, pp. 3-4, ¶ 7.)  DSN disputes these statements "to the extent they are inconsistent with the letter from Lisa Koch . . . to Peo cited therein."  (Plaintiff's Brief, p. 4, ¶ 7.)  The letter appears in the record at filing 30, p. 48.

[7] Again, according to the City,

Peo . . . advised Koch that her requested accommodation from the definition of family might not be necessary in order to obtain a new certificate of occupancy changing the occupancy of the homes in question from single-family to group home as group homes are a permitted conditional use in the districts in which the homes are located. Peo further advised Koch that even if the City granted the requested accommodation to the definition of family, this would not eliminate DSN's duty to meet the fire safety requirements under the State Fire Marshal's Life Safety Code as those requirements were not imposed based upon the City's definition of family and group home. Rather, these fire safety requirements were imposed based upon the definition of residential board and care occupancy in the Life Safety Code (i.e., "a building or part thereof that is used for lodging and boarding of four or more residents, not related by blood or marriage, to the owners or operators, for the purpose of providing personal care services.").

(Defendant's Brief, p. 4, ¶ 8.)  DSN disputes these statements "to the extent they are inconsistent with the letter from Peo to Koch cited therein."  (Plaintiff's Brief, p. 4, ¶ 8.)  The letter appears in the record at filing 30, pp. 49-50.

mile from another group home. Followup communications between DSN and the City on or about March 25, 2004 and April 7, 2004 clarified that DSN was also seeking a reasonable accommodation from the definition of family in the City's Zoning Ordinance requesting that the City treat DSN's group homes at 4000 Lindsey Circle, 2440 S.W. 18th Street, and 3912 South 20th Street as single family dwellings.

10. In response, Peo advised Koch on or about April 12, 2004 that the City did not have authority to administratively grant DSN's requests for reasonable accommodation under the City's Zoning Ordinance. Koch was further advised that such request must be approved by the City Council in accordance with the required procedure for adopting a change of zone which may include text amendments. Specifically, Koch was advised that DSN would need to initiate one of the following alternatives in order for the City to act upon its request for reasonable accommodation from the separation requirement between group homes and from the City's reclassifications of the three homes from single-family dwelling to group homes: (1) file an application for a change of zone to change the definition of "family" to include, for example, four handicapped persons living together as a single housekeeping unit; (2) file an application for a change of zone to reduce or eliminate the spacing requirements between group homes; (3) file an application for a change of zone to add group homes which do not meet the requirements for permitted conditional use as a special permitted use in all districts where group homes are allowed; (4) file an application for any other change of zone DSN deems to be appropriate to accomplish its requested accommodations.

11. Notwithstanding the City's advise [sic] regarding the need to file a request for a change of zone, DSN, through its attorney Scott P. Moore ("Moore"), on or about May 27, 2004 submitted a check for filing fees and two appeals to be forwarded to the City's Board of Zoning Appeals ("BZA") to consider its requested accommodation.

12. On June 2, 2004, Peo spoke with DSN's attorney Moore by telephone regarding the May 27, 2004 letter and Peo's opinion that the BZA did not have authority to grant the requested accommodations. Based upon their discussion, Moore and Peo agreed that Peo would hold

up filing the application with the Board of Zoning Appeals and Moore would check with his client about pursuing the text change.

13. On or about June 4, 2004, Peo again informed Moore that the Board of Zoning Appeals does not have the authority to grant the requested accommodation and again advised DSN that the only way DSN could receive an accommodation from the City was by successfully amending the City Zoning Ordinance.

14. After not receiving any further contact from Moore, Peo, on or about June 14, 2004, sent Moore an e-mail advising Moore that he was still holding the check for the filing fees and DSN's appeals to the Board of Zoning Appeals and inquired as to whether he was to file the appeals or whether DSN was going to pursue relief in a different manner. Peo did not receive a response to this e-mail.

15. DSN . . . [did not] submit an application for a text change of zone and, on or about August 17, 2004, filed this lawsuit . . ..

16. Dwellings, single family, are a permitted use in all residential zoning districts. Group Homes are a conditional permitted use in all residential zoning districts. Specifically, a group home must comply with the following requirements.

> a. All sign, height, and area regulations of the district in which it is located, all provisions of the minimum standard housing ordinance, and parking in conformance with the provisions of Chapter 27.67.

> b. The distance between the proposed group home and an existing group home measured from lot line to lot line is not less than one-half mile or 1200 feet depending upon the residential district the group home is located in; and

> c. The group home must be validly licensed by the State of Nebraska.

17. The minimum standard housing ordinance is the City's Minimum Housing Code which is found in Chapter 21.01 of the Lincoln Municipal Code. Pursuant to Lincoln Municipal Code §21.01.035, the Minimum Housing Code applies to all buildings designed or intended to be used for human habitation.

18. A single-family dwelling must comply with sign, height, area requirements of the district in which it is located and all provisions of the minimum housing ordinance. Parking for a single-family dwelling must be in conformance with the provisions of Chapter 27.67 of the Zoning Ordinance.

. . .

[19.] An example of the zoning regulations governing single-family dwellings and group homes is found in Lincoln Municipal Code Chapter 27.11 which sets forth the district regulations in the R-1 Residential District.[8]

(Defendant's Brief, pp. 2-8, ¶¶ 1-18, 21; Plaintiff's Brief, pp. 3-6) (citations to record omitted).

[20.] On December 2, 2003, DSN filed applications for certificates of occupancy from the City for its homes located at 4000 Lindsay Circle ("Lindsey Home") and 2440 S.W. 18th Street ("[S.W.] 18th Street Home") to increase the number of persons with developmental disabilities it serves in each home from three to four.

[21.] The City refused to issue DSN a certificate of occupancy to operate a home for four persons with developmental disabilities at the Lindsey Home, giving the following two reasons[9] for its refusal:

---

[8] These regulations may be found at filing 30, pp. 11-16.

[9] DSN's evidence shows that the certificate of occupancy was also denied for various "fire prevention/life safety code" reasons. (Filing 40, Ex. A ("LeFevre Affidavit"), attachment 3.)

9

[a.] R-1 Zoning District requires a distance to any other group home not be less than ½ mile. 4000 Lindsey Circle is approximately 1570 feet to a group home located at 3800 Northwest 50th Street.

[b.] A Single family residence can be by definition no more than 3 unrelated by blood. Therefore, it is allowed to care for 3 individuals (like a group home environment) with a care giver on site, but not [with] the caregiver not [sic] residing there.

[22.] The City refused to issue DSN a certificate of occupancy to operate a home for four persons with developmental disabilities at the 18th Street Home, giving the following two reasons[10] for its refusal:

[a.] R-3 Zoning District requires a distance to any other group home not be less than ½ mile. 2440 Southwest 18th Street is approximately 620 feet to a group home located at 2301 Southwest 19th Street.

[b.] A Single family residence can be by definition no more than 3 unrelated by blood. Therefore, it is allowed to care for 3 individuals (like a group home environment) with a care giver on site, but not [with] the caregiver not [sic] residing there.

[23.] Although DSN believed the reasons given for denying the certificates of occupancy were discriminatory, it nonetheless requested a reasonable accommodation from (a) the one-half mile separation requirement imposed on "group homes" in R-1 and R-3 zoning; and (b) the requirement that "a single family residence can be by definition no more than 3 unrelated by blood."

---

[10] Again, DSN's evidence shows that the certificate of occupancy was also denied for various "fire prevention/life safety code" reasons. (LeFevre Affidavit, attachment 4.)

[24.] Because the City has no procedure allowing for a request for reasonable accommodation, DSN sought an accommodation in the form of a variance, which the City denied.

. . .

[25.] Although it had the authority to do so under Lincoln Code § 27.81.040, the City did not seek to amend the Lincoln Code to provide the requested accommodation.

[26.] On August 17, 2004, DSN filed its complaint against the City.

[27.] On October 7, 2004, the City filed its Answer to DSN's complaint.

[28.] On November 23, 2004, DSN served its First Set of Interrogatories and Requests for Production of Documents on the City. The City has not yet [i.e., as of January 24, 2005] responded to DSN's First Set of Requests for Production of Documents.

[29.] On December 8, 2004, the Court entered an Order setting the initial progression of the case and scheduling a Planning Conference for January 26, 2005.

[30.] On that same day, the City filed its motion for summary judgment.

[31.] At that time, the City had not yet responded to DSN's first set of interrogatories and requests for production of documents.

[32.] There have been no depositions taken or scheduled in this case.

(Plaintiff's Brief, pp. 6-9, ¶¶ 22-26, 28-34; Defendant's Reply Brief (filing 42), p. 1.) (citations to record omitted).

11

## DISCUSSION

### *I.*

### *Ripeness of "Reasonable Accommodation" Claim*

I will first consider the jurisdictional issue that has been raised concerning DSN's claim that it was denied reasonable accommodation.[11]  DSN alleges in this regard that "the City . . . [does not have] procedures for housing providers for persons with disabilities to follow to request a reasonable accommodation[,]" (Complaint (filing 1), ¶ 15), but that it "nonetheless requested a reasonable accommodation from the City . . . as described below."  (Id.)

> DSN repeatedly requested the City for a reasonable accommodation from the separation requirement [that group homes cannot be located within ½ mile of each other, see Complaint, ¶¶ 13, 20; Answer (filing 14) ¶¶ 13, 20], and from the City's reclassification of the three homes from "family" to "group home."  The City denied DSN's requests. DSN then requested that the City"s Board of Zoning Appeals consider its request for reasonable accommodation.  On or about June 4, 2004, the City informed DSN that the Board of Zoning Appeals did not have the authority to grant the requested accommodation and the only way DSN would receive relief from the City was by successfully amending the City's municipal code.  The City made no assessment of the need for the requested accommodation nor if the requested accommodation would impose an undue burden on the City.

(Complaint, ¶ 16.)

---

[11] It is generally recognized that plaintiffs who allege violations under the ADA, FHAA, and Rehabilitation Act may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation. See Regional Economic Community Action Program, Inc., v. City of Middletown ("RECAP"), 294 F.3d 35, 48 (2nd Cir. 2002).  All three Acts also prohibit retaliatory conduct.  See id., at 53-54.

These allegations are generally denied by the City, but, at the same time, it affirmatively alleges that "the City does not have the authority to administratively grant requests for reasonable accommodation from the City's Zoning Ordinance. Rather, such requests must be approved by the City Council in accordance with its required procedure for adopting a change of zone which may include text amendments." (Answer, ¶ 15.)

> The City alleges that the City specifically advised DSN to initiate one of the following alternatives in order for the City to act upon its request for a reasonable accommodation from the separation requirement between group homes and from the City's reclassification of the three homes from single-family dwelling to group home: (1) file an application for a change of zone to change the definition of "family" to include, for example, four handicapped persons living together as a single housekeeping unit; (2) file an application for a change of zone to reduce or eliminate the spacing requirements between group homes; (3) file an application for a change of zone to add group homes which do not meet the requirements for a permitted conditional use as a special permitted use in all districts where group homes are allowed; (4) file an application for any other change of zone DSN deems to be appropriate to accomplish its requested accommodations.

> . . . [T]he City affirmatively alleges that notwithstanding the City's advice described . . . above, DSN submitted an application to the City's Board of Zoning Appeals to consider the requested accommodation.  In response, the City, on or about June 4, 2004, informed DSN that the Board of Zoning Appeals did not have the authority to grant the requested accommodation and again advised DSN that the only way DSN could receive an accommodation from the City was by successfully amending the City's Zoning Ordinance.

(Answer, ¶¶ 15-16.)   The City's allegations are substantiated by affidavits and authenticated documents (see Filing 30, Ex. A, B, C), and, except insofar as DSN contends that it would have been futile for it to seek amendment of the Zoning Ordinance, there is no factual dispute.

13

The City argues that DSN's "reasonable accommodation" claim is not ripe for decision because DSN failed or refused to apply to the City Council for amendment of the Lincoln Municipal Code.  I disagree.  The fact that the City does not have an administrative procedure through which its Planning Department or Board of Zoning Appeals can grant requests for reasonable accommodation based on disability – and that the requesting party's only recourse (other than filing suit) is to seek a legislative change from the City Council – does not make the City's repeated denials of DSN's requests "non-final" and thus not ripe for litigation.

"The ripeness doctrine flows both from the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction."  Public Water Supply Dist. No. 10 of Cass County v. City of Peculiar, 345 F.3d 570, 572 (8th Cir. 2003) (quoting Nebraska Public Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1039 (8th Cir. 2000)).  "The purpose of the ripeness doctrine is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  McCarthy v. Ozark School Dist., 359 F.3d 1029, 1037 (8th Cir. 2004) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)).

The administrative procedure has run its course here, with the result that DSN has been prohibited by the City from increasing the number of disabled residents at the Lindsey Home, S.W. 18th Street Home, and 20th Street Home from three to four. The evidence shows that DSN applied to change the use of the Lindsey Home and S.W. 18th Street Home from single-family to group home, and that such applications were denied, in part, because they are located within ½ mile of existing group homes. (LeFevre Affidavit, attachments 1-4.)  DSN's request that the ½ mile restriction not be applied to these two homes was denied.  As to all three homes, DSN also requested that they remain classified as single-family residences even though they would be

14

occupied by four unrelated persons.  This request for accommodation was likewise denied.  It was also requested that the City permit all three homes to be occupied by four disabled persons despite their noncompliance with Chapter 23 of the 1994 Life Safety Code, and that the City notify the Nebraska Department of Health and Human Services that the homes were certified for occupancy by four disabled persons (and therefore eligible for licensing as a center for the developmentally disabled).[12]  (Filing 30, pp. 63-66.)  I do not understand the City to be arguing that DSN should have applied for amendment of the Zoning Ordinance regarding the application of fire safety regulations.  Instead, the City apparently believes that it need not address this part of DSN's "reasonable accommodation" claim except to state that it told DSN to apply to the State Fire Marshal for a waiver.

DSN has also presented evidence that it filed appeals (including requests for variances) with the Board of Zoning Appeals regarding the denials of the change of occupancy for the Lindsey Home and S.W. 18th Street Home.[13]  (LeFevre Affidavit, attachments 14, 15.)  The City's evidence shows, however, that the city attorney did not forward these appeals to the Board because the City took the position – and advised DSN – that the Board had no authority to grant relief.

Given the city attorney's intervention, neither the lack of formal filing of the appeals nor the lack of formal action by the Board is problematic.  Litigants are not required to make futile gestures to establish ripeness.  South Dakota Min. Ass'n, Inc. v. Lawrence County, 155 F.3d 1005, 1009 (8th Cir. 1998) (plaintiffs were not

---

[12]  It appears from the complaint that a similar request for accommodation may have been made with reference to the group home(s) that DSN operated at 3800/06 N.W. 50th Street (see Complaint, ¶ 18), but no evidence concerning this property has been provided by either party.

[13] The City's evidence also include a written appeal for the 20th Street Home which recites that an application for change of occupancy was filed on November 20, 2003.  (Filing 30, p.70.)

required to apply for and be denied county permits for surface metal mining where plain text of county ordinance prohibited issuance of such permits).

The present case is very different from Oxford House-C v. City of St. Louis, 77 F.3d 249 (8th Cir. 1996), in which two group homes for recovering alcoholics and drug addicts sought to enjoin enforcement of a city zoning ordinance that limited their occupancy size (by defining single family dwellings to include group homes with eight or fewer unrelated handicapped residents) and the Court of Appeals held that the plaintiffs' claim for reasonable accommodation under the Fair Housing Act (as amended by the FHAA) was precluded by their refusal to apply for a zoning variance. The Court there explained:

> [T]he City did not fail to accommodate the Oxford Houses as the Act requires. See 42 U.S.C. § 3604(f)(3)(B). The Oxford Houses want the City to let them operate with more than eight residents. The City has consistently said it cannot make an exception to the zoning code unless the Oxford Houses apply to the City's Board of Adjustments for a variance, see St. Louis, Mo., Rev. Code tit. 26, § 26.84.050(D) (1994), and the Oxford Houses refuse to apply. Their refusal is fatal to their reasonable accommodation claim. The Oxford Houses must give the City a chance to accommodate them through the City's established procedures for adjusting the zoning code. See United States v. Village of Palatine, 37 F.3d 1230, 1233 (7th Cir.1994); Oxford House, Inc. v. City of Virginia Beach, 825 F. Supp. 1251, 1261 (E.D.Va.1993).[14] The Fair Housing Act does not "insulate [the Oxford House residents] from legitimate inquiries designed to enable local authorities to make informed decisions on zoning issues." City of Virginia Beach, 825 F. Supp. at 1262. Congress did not intend for the Act to remove handicapped people from the "normal and usual incidents of citizenship, such as participation in the public components of zoning decisions, to the extent that participation is required of all citizens whether or not they are handicapped." Id. In our view, Congress also did not intend the

_____

[14] The courts in the Palatine and Virginia Beach dismissed the plaintiffs' "reasonable accommodation" claims without prejudice because they were not ripe.

federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance. Id. at 1261.

Id., 77 F.3d at 253.

The principal difference between Oxford House-C and the present case, obviously, is that the City of Lincoln does not have any "established procedures for adjusting the zoning code." While the City argues that a text change made pursuant to Lincoln Municipal Code § 27.81.040 would be a zoning code "adjustment," the Eighth Circuit in Oxford House-C was specifically referring to a variance (i.e., "[a] license or official authorization to depart from a zoning law," Black's Law Dictionary (8th ed. 2004)). The St. Louis Board of Adjustments evidently had broad authority to grant use variances, but the Lincoln Board of Zoning Appeals is only authorized to grant variances with respect to the application of "height, area, parking, density or sign requirements." Lincoln Municipal Code § 27.75.040 (filing 30, p. 18).[15]

The City also relies upon the Eighth Circuit's subsequent decision in Oxford House-A v. City of University City, 87 F.3d 1022 (8th Cir. 1996), in which a group home with ten residents was being operated without a required occupancy permit. Because the zoning code defined a "family" to include a group of three unrelated individuals, the city attorney advised the group home that it must either apply for a special use permit, which the city would process quickly, or seek amendment of the zoning code. The group home filed suit, but later applied for an amendment to the code's definition of "family." The city council rejected the group home's proposed amendment, but adopted its own amendment to conform to a state statute which provided that homes with eight or fewer unrelated mentally or physically handicapped residents and two houseparents qualified as single-family dwellings. Based upon the amended zoning code, and after the city further agreed to treat two of the group

---

[15] DSN does not contend that the zoning restrictions at issue in this case are "density" requirements for which the Board has the authority to grant variances.

17

home's residents as houseparents, an occupancy permit was issued.  The group home then dismissed its action without prejudice while reserving the right to seek attorney's fees.  The district court awarded the group home $35,000 in attorney's fees on a "catalyst" theory, but the Court of Appeals reversed on de novo review, finding that the Oxford House-C decision "establishes that the lawsuit was unreasonable because Oxford House did not first give the City an opportunity to grant a reasonable accommodation."  Id., 87 F.3d at 1023.  It stated:

> As in Oxford House-C, Oxford House sued before exhausting available, non-futile procedures under the City's zoning ordinances, procedures which, when invoked, produced a "reasonable accommodation" of Oxford House's desire for a ten-resident group home.  Thus, the timing of the lawsuit was unreasonable. . . .
>
> . . .
>
> It is not the function of the catalyst theory to encourage FHA plaintiffs to file premature, superfluous lawsuits which then sputter fitfully, clogging district court dockets, while plaintiffs trudge through the administrative process, hopeful that the pending lawsuits will justify attorney's fee awards when local officials administratively accommodate the dwelling needs of the handicapped.  Because that is essentially what happened here, and because our decision in Oxford House-C confirms that the lawsuit was unreasonable, the district court's award of costs and attorney's fees is reversed.

Id., 87 F.3d at 1024-25.

While Oxford House-A involved an amendment to the zoning ordinance, the group home in that case also had the option of applying for a special use permit.  In fact, the code changes made by the St. Louis City Council "did not necessarily solve Oxford House's problem," id., 87 F.3d at 1023, but city officials decided to permit the group home to exceed the newly enacted limit of eight residents.  The Eighth Circuit states that "essentially what happened" during the pendency of the Oxford

18

<u>House-A</u> lawsuit was that "local officials administratively accomodate[d] the dwelling needs of the handicapped." <u>Id.</u>, 87 F.3d at 1025.

Action taken by a city council to change the definition of "family" in a zoning code (or to modify the minimum distance requirement for group homes) is clearly legislative in nature. As explained in <u>Kubicek v. City of Lincoln</u>, 658 N.W.2d 291, 298 (Neb. 2003):

> If an ordinance enacts a law or lays down a course of policy to guide the citizens, there can be no question that it is legislative in character; but if it serves simply to put into execution previously enacted laws, it is clearly executive or administrative in nature. <u>State ex rel. Ballantyne v. Leeman</u>, 149 Neb. 847, 32 N.W.2d 918 (1948). As appellants concede, "[t]he crucial test for determining that which is legislative [ordinance] from that which is administrative or executive [resolution] is whether the action taken was one making a law, or executing or administering a law already in existence." <u>Kelley v. John</u>, 162 Neb. 319, 321, 75 N.W.2d 713, 715 (1956); <u>State ex rel. Ballantyne v. Leeman</u>, <u>supra</u>; <u>State ex rel. Nelson v. Butler</u>, 145 Neb. 638, 17 N.W.2d 683 (1945); <u>Read v. City of Scottsbluff</u>, 139 Neb. 418, 297 N.W. 669 (1941).

There is some authority which holds that a text change to a zoning ordinance may be a "reasonable accommodation." <u>See</u>, <u>e.g.</u>, <u>Smith & Lee Assoc., Inc. v. City of Taylor, Mich.</u>, 13 F.3d 920, 929-32 (6th Cir. 1993) (where city had no available procedure for granting variance, amendment of zoning ordinance might be required), <u>on appeal after remand</u>, 102 F.3d 781, 796-97 (6th Cir. 1996) (district court exceeded its authority by ordering city to amend ordinance to adopt the court's definition of "family," but enforcement of ordinance could be enjoined to the extent that it violated the FHAA). But <u>cf.</u> <u>MX Group, Inc. v. City of Covington</u>, 293 F.3d 326, 344-45 (6th Cir. 2002) (ordinance which prohibited all methadone clinics in entire city was discriminatory on its face and was not subject to "reasonable accommodation" because amendment to remove the discriminating feature would fundamentally alter

19

the ordinance; hence, plaintiff was not required to seek text change); Bay Area Addiction Research and Treatment, Inc. v. City of Antioch, 179 F.3d 725, 733-35 (9th Cir. 1999) ("reasonable modifications" test under Title II of ADA[16] does not apply to facially discriminatory laws, which are per se violations of § 12132); Bangerter v. Orem City Corp., 46 F.3d 1491, 1502 (10th Cir. 1995) (the thrust of a "reasonable accommodation" claim is that a defendant must make an affirmative change in an otherwise valid law or policy; reasonable accommodation is inappropriate where ordinance applies only to group homes for the handicapped).

However, there is no authority which holds that initiation or exhaustion of legislative remedies is essential to a claim under the FHAA, the ADA, or the Rehabilitation Act alleging that a city has failed to make reasonable accommodation for the disabled in its zoning laws. I therefore find that the ripeness doctrine does not preclude consideration of Count II of DSN's complaint.

## II.
### Allegations of Disparate Treatment and Disparate Impact

The City argues that claims of "disparate treatment" and "disparate impact" are inconsistent and cannot be maintained simultaneously.[17] The simple response to this argument is that federal pleading practice permits a party to "state as may separate claims . . . as the party has regardless of consistency . . .." Fed. R. Civ. P. 8(e)(2).

_____

[16] 28 C.F.R. § 35.130(b)(7) provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

[17] Without explanation, the City has selected the "disparate impact" claim for dismissal on this basis.

20

### III.

### *Allegations of a Facially Discriminatory Zoning Ordinance*

The City, citing the Eighth Circuit's <u>Oxford House-C</u> and <u>Oxford House-A</u> opinions, argues that "[s]ince the definition of family in the Zoning Ordinance[18] applies equally to handicapped and non-handicapped persons, it is not facially discriminatory[,]" and "[t]herefore, Counts I and III of the [sic] DSN's complaint alleging intentional discrimination on the basis that the City Zoning Ordinance is facially discriminatory should be dismissed . . .."[19]   (Defendant's Brief, pp. 10, 12.)

---

[18] Lincoln Municipal Code § 27.03.220 ("Family") provides:

> One or more persons immediately related by blood, marriage, or adoption and living as a single housekeeping unit in a dwelling shall constitute a family.  A family may include, in addition, not more than two persons who are unrelated for the purpose of this title. The following persons shall be considered related for the purpose of this title:
> (1) A person residing with a family for the purpose of adoption;
> (2) Not more than six persons under nineteen years of age, residing in a foster home licensed or approved by the State of Nebraska;
> (3) Not more than four persons nineteen years of age or older residing with a family for the purpose of receiving foster care licensed or approved by the state or its delegate;
> (4) Any person who is living with a family at the direction of a court.

The City construes this definition to provide that three unrelated individuals can comprise a "family" (<u>i.e.</u>, one person plus two additional unrelated persons).

[19] DSN alleges in Count I that the City and the State Fire Marshal intentionally discriminated on the basis of disability when they imposed conditions on, delayed the issuance of, and denied DSN's applications for permits to operate its homes. (Complaint, ¶¶ 31-32.)   "Disparate impact" and "retaliation" (or, more properly, "interference" with FHAA rights) are also alleged in Count I.  (<u>Id.</u>, ¶¶ 33, 34.)  DSN

21

The only allegations of facial discrimination contained in DSN's complaint, however, concern the Zoning Ordinance's "group home" provisions.[20]

_____

alleges in Count III that the State Fire Marshal's regulations and the City's ordinances are discriminatory on their face and as applied.

[20] Lincoln Municipal Code § 27.03.300 ("Group Home") provides:

Group home shall mean a facility in which more than two but less than sixteen persons who are unrelated by blood, marriage, or adoption reside while receiving therapy or counseling, but not nursing care, for any of the purposes listed below.  Such facility shall be licensed or approved by the State of Nebraska or other appropriate agency.
(a) Adaptation to living with, or rehabilitation from, the handicaps of physical disability;
(b) Adaptation to living with, or rehabilitation from, the handicaps of emotional or mental disorder, or mental retardation;
(c) Rehabilitation from the effects of drug or alcohol abuse;
(d) Supervision while under a program of alternatives to imprisonment, including but not limited to pre-release, work-release, and probationary programs.

Lincoln Municipal Code § 27.11.030 ("Permitted Conditional Uses"), which applies to R-1 residential districts, provides, in part:

A building or premises may be used for the following purposes in the R-1 Residential District in conformance with the conditions prescribed herein:
. . .
(b) Group homes:
(1) Group homes shall comply with all sign, height, and area regulations of the district, and all provisions of the minimum standard housing ordinance.  Parking shall be regulated in conformance with the provisions of Chapter 27.67;
(2) The distance between the proposed use and any existing group home measured from lot line to lot line is not less than one-half mile;

Even though not all residents of "group homes" as defined in the Zoning Ordinance are disabled, there is considerable support for DSN's claim that the restrictions placed on group homes – particularly the ½ mile spacing requirement – are facially discriminatory.  See e.g., Larkin v. State of Michigan Dept. of Social Services, 89 F.3d 285, 289-90 (6th Cir. 1996) (spacing and notice requirements for adult foster care facilities were facially discriminatory under the FHAA); Arc of New Jersey, Inc. v. State of New Jersey, 950 F. Supp. 637, 644 (D.N.J. 1996) (state law allowing cities to enact spacing requirements and quotas for community residences for the developmentally disabled, and to require conditional use permits, was facially discriminatory; that the statute applied to certain other group homes did not negate its facial discrimination against the disabled); Association for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth, 876 F.Supp. 614, 621-22 & n. 6 (D.N.J. 1994) (ordinance discriminated on its face by imposing conditions on community residences for the developmentally disabled; it did not matter that the ordinance also applied to community shelters for victims of domestic violence); Horizon House Developmental Services, Inc. v. Township of Upper Southampton, 804 F. Supp. 683, 693-94 (E.D.Pa. 1992)  (1000-foot spacing requirement for group homes was facially discriminatory; it was "irrelevant that the spacing requirement may incidentally catch within its net some unrelated groups of people without handicaps, such as juveniles or ex-criminal offenders, that live in supervised housing arrangements"), aff'd without opinion, 995 F.2d 217 (3rd Cir.1993).  This is not to say that a facially discriminatory requirement is necessarily unlawful, however.  See Bangerter v. Orem City Corp., 46 F.3d 1491, 1500 (10th Cir. 1995) (while there was no doubt that ordinance requiring 24-hour supervision as a condition to issuing a conditional use permit for a group home was discriminatory, legality or illegality of ordinance under FHAA remained to be determined).

---

(3) Such use shall be permitted only so long as the facility continues to be validly licensed by the State of Nebraska.

The City's motion also asserts that DSN is unable to establish a prima facie case of "disparate impact," but, because it only argues that this claim should be dismissed as being inconsistent with the "disparate treatment" claim, it will be presumed that DSN can meet its initial burden of proving that the ordinances effectively discriminate against the handicapped.  See NECivR 7.1.  However, the City does argue with respect to this claim, and also the "disparate treatment" claim, that the Zoning Ordinance is rationally related to a legitimate governmental interest.

## IV.
### Applicability of the Rational Relationship Test

In Familystyle of St. Paul, Inc. v. City of St. Paul, 923 F.2d 91 (8th Cir. 1991), the Court of Appeals considered whether a ¼-mile spacing requirement for group homes violated the FHAA.  It concluded that the requirement was a valid means of promoting deinstitutionalization for the mentally ill, stating:

> In United States v. City of Black Jack, 508 F.2d 1179 (8th Cir.1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), we explained that in a Title VIII case brought against a public defendant, the plaintiff has the initial burden of presenting a prima facie case of the discriminatory effect of the challenged law.  Id. at 1185.  If the law is shown to have such an effect, the burden shifts to the governmental defendant to demonstrate that its conduct was necessary to promote a governmental interest commensurate with the level of scrutiny afforded the class of people affected by the law under the equal protection clause.  Id. at 1185 n. 4.

> The district court measured the government's interest in the second part of its analysis using the considerations defined in Black Jack, a racial discriminatory impact case.  We conclude, however, that the appropriate level of scrutiny is that announced in City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313 (1985), in which the Court held that persons suffering from mental retardation do not constitute a suspect class. The second question

24

in the disparate impact analysis under Title VIII then becomes whether legislation which distinguishes between the mentally impaired and others is "rationally related to a legitimate governmental purpose." Id.

The district court found that although local and state dispersal requirements for group homes on their face limit housing choices for the mentally ill, the government's interest in deinstitutionalization sufficiently rebutted any discriminatory effect of the laws. 728 F.Supp. 1396. Familystyle argues that the district court misapplied the factors relevant in evaluating the government's interest in dispersal requirements. We disagree.

The district court examined the reasons for the state and local law under the strict scrutiny standard. Although we believe that it is not necessary to evaluate the purposes so closely, we agree with the district court that the government's interests are valid. The state aims to integrate the mentally ill into the mainstream of society. One method to achieve that goal is to license group homes which advance the process of deinstitutionalization. . . .

Had the state or city intended to discriminate against the mentally ill, one sure way would be to situate all group homes in the same neighborhood – a situation for which Familystyle argues. The state's group home dispersal requirements are designed to ensure that mentally handicapped persons needing residential treatment will not be forced into enclaves of treatment facilities that would replicate and thus perpetuate the isolation resulting from institutionalization.

Id., 923 F.2d at 94-95.

Other circuits have since held that the "rational relationship" test is unsuited to analyzing disability discrimination claims under the FHAA. See Bangerter, 46 F.3d at 1503-04 (holding that the defendant must show that facially discriminatory statutes either (1) are justified by individualized safety concerns, or (2) really benefit, rather than discriminate against, the handicapped, and are not based on unsupported stereotypes); Larkin, 89 F.3d at 290 (stating that in order for facially discriminatory

25

statutes to survive a challenge under the FHAA, the defendant must demonstrate that they are "warranted by the unique and specific needs and abilities of those handicapped persons" to whom the regulations apply) (citation omitted). This court, of course, is bound to follow Eighth Circuit precedent. See Hood v. United States, 342 F.3d 861, 864 (8th Cir. 2003).

While one might attempt to distinguish Familystyle from Bangerter and Larkin by arguing that Familystyle was a "disparate impact" case rather then a "disparate treatment" case, it is unlikely that the Eighth Circuit would make such a distinction. The plaintiff in Familystyle "argue[d] that the state and city dispersal requirements result in a disparate impact on and discriminatory treatment of the mentally ill." 923 F.2d at 94. The Eighth Circuit did not discuss the "disparate treatment" claim, but the district court rejected the claim because there was no evidence that the state and city passed the laws in question with the intent of discriminating against the handicapped. Familystyle of St. Paul, Inc. v. City of St. Paul, 728 F.Supp. 1396, 1402-03 (D.Minn. 1990). Subsequently, however, in International Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991), the Supreme Court held that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." See Larkin, 89 F.3d at 290 (stating that both decisions in Familystyle have been implicitly overruled by Johnson Controls in this regard). Thus, if decided today, Familystyle would be considered a "disparate treatment" case. In any event, Cleburne was also a "disparate treatment" case, but the Eighth Circuit had no hesitancy in applying its principles to what was then perceived to be a "disparate impact" case to find that the group home spacing requirement was valid.

In summary, I understand the law in this circuit to be as follows: A zoning ordinance that discriminates against the handicapped – either on its face or in effect – must be upheld if it is rationally related to some legitimate governmental interest.

26

Also, as will be discussed below, the burden of proof is on the plaintiff to establish the lack of such a rational relationship.

DSN argues that it is premature to consider its allegations that the Zoning Ordinance's group home spacing requirement and definition of "family" violate the FHAA, the ADA, and the Rehabilitation Act because there has not been adequate time for discovery.  In particular, DSN contends that it must explore "[w]hether the City has any empirical evidence supporting its proffered justifications for the separation requirement" and "[w]hether the City cited these justifications when it passed the separation requirement . . .."  (Plaintiff's Brief, p. 20.)[21]  Neither of these inquiries is relevant to the pending motion for summary judgment.

Applying the "rational relationship" test, a court must reject a challenge to a facially discriminatory law "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Carter v. Arkansas, 392 F.3d 965, 968 (8th Cir. 2004).

> Indeed, a legislative choice may be based on rational speculation unsupported by evidence or empirical data.  Thus, because all that must be shown is "any reasonably conceivable state of facts that could provide a rational basis for the classification," it is not necessary to wait

---

[21] DSN also states that it must conduct discovery regarding "[w]hether the City Planning Department applies the Lincoln Code equally to persons with disabilities" and "[w]hether the City Planning Department enforces the restrictions created by the definition of 'family' on housing of four or more unrelated people without disabilities."  (Plaintiff's Brief, p. 20.)  These discovery matters, however, concern claims of intentional discrimination that do not depend upon whether the Zoning Ordinance is facially discriminatory or has a disparate impact upon the handicapped. In other words, those claims are not subject to the "rational relationship" test.  As DSN correctly notes, "[t]he City's motion does not address the 'as applied' claim, not DSN's claim that the City flatly treated DSN less favorably than others without disabilities."  (Id., p. 18.)

27

> for further factual development. In other words, a district court may
> conduct a rational basis review on a motion to dismiss.

Id. (internal quotations and citations omitted).  "A reasonable relationship between the governmental interest and the challenged restriction does not require an exact fit, nor does it require showing a least restrictive alternative." Gunderson v. Hvass  339 F.3d 639, 644 (8th Cir. 2003) (quoting Valdez v. Rosenbaum, 302 F.3d 1039, 1046 (9th Cir. 2002)).  Thus, as long as a plausible reason exists for the classification, the court's scrutiny must end.  Knapp v. Hanson, 183 F.3d 786, 789 (8th Cir. 1999).

Under a rational basis standard of review, the Zoning Ordinance carries with it a "strong presumption of validity."  Id.  Consequently, DSN "has the burden of proving 'that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational[,]' . . . [and] must also negate 'every conceivable basis which might support' the classification." Red River Service Corp. v. City of Minot, 146 F.3d 583, 590 (8th Cir. 1998) (citations omitted).  It is "entirely irrelevant" whether the conceived reason for the challenged distinction actually motivated the City.  See Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.,  21 F.3d 237, 241 (8th Cir. 1994).

In light of the Eighth Circuit's holding in Familystyle, and absent any showing by DSN that the City of Lincoln's ½-mile spacing requirement for group homes cannot possibly serve the same legitimate purpose as the City of St. Paul's ¼-mile spacing requirement, I am compelled to find that there is no triable issue regarding the validity of ordinances in which the spacing requirement appears (e.g., Lincoln Municipal Code § 27.11.030).  The City has alleged that "the spacing requirement between group homes is designed to address the need of providing residential services to the handicapped/disabled in community settings rather than recreating an institutional environment."  (Answer, ¶ 56.)  DSN has presented no evidence to

disprove this allegation,[22] nor has it made a sufficient showing to excuse its failure to present such evidence at this time. Federal Rule of Civil Procedure 56(c) does not require discovery to be complete in order for summary judgment to be proper. Bradford v. DANA Corp., 249 F.3d 807, 810 (8th Cir. 2001). A party opposing summary judgment and seeking relief pursuant to Rule 56(f) must show "what specific facts further discovery might unveil." United States ex.rel. Bernard v. Casino Magic Corp., 293 F.3d 419, 426 (8th Cir. 2002). As discussed above, DSN has not shown that any relevant facts remain to be discovered. "Rule 56(f) is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." Duffy v. Wolle, 123 F.3d 1026, 1040 (8th Cir. 1997).

Similarly, I find that no genuine issue of material fact exists regarding the validity of the definition of "family" in Lincoln Municipal Code § 27.03.220. The Supreme Court has held that a zoning ordinance which defines "family" to include not more than two unrelated persons living together is rationally related to a

---

[22] Indeed, DSN has submitted a draft final report by the Mayor's Group Homes Task Force, dated October 12, 2004, which recommends that the spacing requirement be retained. The report states:

> The Task Force believes spacing benefits group home residents. The goal of providers and state regulators is to transition the disabled population from institutional settings to community-based facilities. The apparent intent is to provide a quality of life experience similar to mainstream society as possible. Therefore, although concentrating facilities may serve the economic and efficiency interests of providers, it does not serve the goal of providing a traditional residential setting for the residents. The Task Force determined the economic benefits to paid providers achieved by clustering group homes do not outweigh the benefits of providing a traditional residential environment.

(LeFevre Affidavit, attachment 16, p. 10.)

29

legitimate governmental interest in creating "[a] quiet place where yards are wide, people few, and motor vehicles restricted," <u>Village of Belle Terre v. Boraas</u>, 416 U.S. 1, 9 (1974), and has stated that "family composition rules are an essential component of single-family residential use restrictions." <u>City of Edmonds v. Oxford House, Inc.</u>, 514 U.S. 725, 733 (1995).  In fact, the Lincoln ordinance was specifically upheld on this basis by the Nebraska Supreme Court in <u>State v. Champoux</u>, 566 N.W.2d 763, 768 (Neb. 1997) (Lincoln Municipal Code § 27.03.220 did not violate due process clause of Nebraska Constitution), with the Court finding that "the city of Lincoln enacted a zoning ordinance clearly within the ambit of its police power and defined 'family' in a way that is rationally related to its legitimate objectives of preserving the sanctity of the family, quiet neighborhoods, low population, few motor vehicles, and low transiency."  The City has also alleged in the present case that the ordinance "serve[s] the City's legitimate interest in preserving single-family neighborhoods, and decreasing traffic congestion and noise in residential areas."  (Answer, ¶ 56.)  DSN has not presented any evidence to refute this allegation, nor has it made a sufficient showing under Rule 56(f) that discovery is needed on this point.

The City has filed a supplemental index of evidence (filing 43) which, among other things, details the City's adoption of the Zoning Ordinance in 1979, including the definition of "family" and the group home spacing requirement.  DSN has moved to strike this filing, and also related portions of the City's reply brief, contending that the materials were not previously disclosed and do not "address factual or legal issues raised in [DSN's] opposing brief," <u>see</u> NECivR 7.1(c) ("Replying to Opposing Briefs and Evidence").  DSN's motion (filing 48) will be denied.

The supplemental index consists of three parts.  The first part is the Affidavit of Marvin Krout, Director of Planning for the City of Lincoln, with several attached departmental records pertaining to the adoption of the City's Zoning Ordinance. (Filing 43, Ex. A ("Krout Affidavit").)  Because the City does not have the burden of proving that the Zoning Ordinance is rationally related to a legitimate governmental

30

interest, DSN is not prejudiced by the City's failure to include this material in its original evidentiary filing.  The City has also explained that its Rule 26(a) initial disclosure identified Mr. Krout as a person who had information about the purpose of the Zoning Ordinance provisions, that several of the documents were provided to DSN on January 11, 2005, in connection with the City's supplemental answers to interrogatories (in advance of DSN's response to the summary judgment motion), and that the City Attorney did not receive DSN's requests for production of documents until he was provided with a copy on January 25, 2005 (approximately one week before the City filed its reply brief and supplemental index of evidence).  See Affidavit of Ernest R. Peo, III, in Opposition to Plaintiff's Motion to Strike (filing 55, Ex. A ("Peo Affidavit").).  Exclusion of the Krout Affidavit and attachments is not required under Federal Rule of Civil Procedure 37(c)(1).[23]  Although this evidence is not essential to the City's motion for summary judgment, it does provide support for finding that the definition of "family" and the group home spacing requirement serve legitimate goals.

The second part of the City's supplemental index of evidence is the Affidavit of Teresa Meier, Deputy City Clerk of the City of Lincoln, with attached records pertaining to the City's amendment of ordinances in 1999 to remove boarding and lodging houses as permitted uses in R-6, R-7, and R-8 residential zoning districts. DSN has not moved to strike this material, which appears responsive to a statement made in DSN's brief that boarding homes (with more than three unrelated residents) are permitted as a matter of right in R-7 and R-8 districts.  Paragraph 6 of the Krout Affidavit also touches upon this point, and is not objectionable.

---

[23] "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. . . ."  Fed. R. Civ. P. 37(c)(1).

The third and final part of the supplemental index is the Affidavit of John Boies, Chief Housing Inspector for the City's Department of Building and Safety, with attached records pertaining to the department's investigation of complaints of overcrowding. (Filing 43, Ex. C ("Boies Affidavit").)  The attachments were first provided to DSN on January 11, 2005, with the City's supplemental answers to interrogatories. See Peo Affidavit, ¶ 9. The apparent purpose of these documents is to show that the City enforces the "family" definition without discrimination, as the City argues that "[t]he Boies Affidavit addresses the Plaintiff's argument that the City has not addressed the Plaintiff's claim that the City treated DSN less favorably than others without disabilities." (Defendant's Brief in Opposition to Motion to Strike (filing 54), p. 4.) If the City wished to address DSN's allegation that the ordinance was applied in a discriminatory manner, it should have done so in its original filing. See NECivR 7.1(a) and 56.1(a). Because the supplemental evidence is not related to the City's or DSN's statement of material facts, it is not entitled to any consideration.

While I will not consider the Boies Affidavit in conjunction with the City's motion for summary judgment, neither will I order it stricken.  DSN's motion to strike recites that it is made pursuant to Federal Rule of Civil Procedure 12(f), which, "as the cases make clear, is neither an authorized nor a proper way . . . to strike an opponent's affidavits."  5C Charles Alan Wright & Arthur R. Miller, Federal Rules of Civil Procedure § 1380, pp. 391-92 (3d ed. 2004)(footnotes omitted). That is to say, Rule 12(f) only pertains to "pleadings," which do not include affidavits or briefs. See Fed. R. Civ. P. 7(a).

## V.  Allegations of Interference with FHAA Rights

DSN alleges in Count I of its complaint that "[t]he conduct of the City and the Fire Marshal of imposing conditions on DSN's application for permits to operate its homes, delaying the issuance of the appropriate permits for DSN to operate its homes, failing to consider a reasonable accommodation with regard to DSN's application to

32

operate its homes, failing to grant a reasonable accommodation to DSN to operate its homes, and denying the appropriate permits for DSN to operate its homes, denied DSN the opportunity to establish and operate housing for persons with disabilities." (Complaint, ¶ 31.)  It is then alleged that such conduct "was taken on the basis of disability of the residents and prospective residents of DSN's homes in violation of 42 U.S.C. §§ 3604(f)(1)and (f)(2)" (Id., ¶ 32),[24] "had a disparate impact or effect on housing opportunities of DSN, the current and proposed residents of homes operated by DSN, and other persons with disabilities who seek to live in the City of Lincoln in violation of 42 U.S.C. § 3601, et seq." (Id., ¶ 33), and "coerced, intimidated, threatened, or interfered with DSN's exercise or enjoyment of rights protected by 42 U.S.C. § 3601, et seq. and violated 42 U.S.C. § 3617" (Id., ¶ 34).  Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.

---

[24] Under 42 U.S.C. § 3604(f)(1), it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of–
"(A) that buyer or renter,
"(B) a person residing in or intending to reside in that dwelling after it has been sold, rented, or made available; or
"(C) any person associated with that buyer or renter."

Similarly, 42 U.S.C. § 3604(f)(2) makes it unlawful"[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of–
"(A) that person;
"(B) a person residing in or intending to reside in that dwelling after it has been sold, rented, or made available; or
"(C) any person associated with that person."

The City argues that "[i]f the City's Motions [sic] for Summary Judgment are granted against DSN on its claims for discrimination based upon disparate treatment and disparate impact, DSN's claim of retaliation under § 3617 must likewise fail as said claim is based on the same conduct of the City that caused the disparate treatment or disparate impact engaged in by the City." (Defendant's Brief, p. 20.) While the complaint might be construed to allege a § 3617 claim that goes beyond the facts of the "disparate treatment" and "disparate impact" claims that were addressed in the City's brief, DSN does not dispute the City's premise. Instead, DSN merely argues that "[b]ecause the City bases its Motion for Summary Judgment as to DSN's § 3617 claim on the same arguments as its Motion as to Counts I and III, the Court should deny the City's request to dismiss DSN's § 3617 claim pursuant to Fed. R. Civ. P. 56(f) . . . [because] DSN needs sufficient time to conduct discovery on the questions of material fact which affect the outcome of the City's Motion." (Plaintiff's Brief, pp. 21-22.) I understand from DSN's briefing that, as contended by the City, the § 3617 claim essentially is limited to an allegation that the Zoning Ordinance's "family" definition and group home spacing requirements interfere with the exercise of DSN's rights protected by § 3604(f).[25]

I have found that the City is entitled to summary judgment on DSN's claims that the Zoning Ordinance provisions violate § 3604 because they allegedly are discriminatory on their face or adversely affect handicapped persons. That being the

---

[25] Zoning is a type of activity to which § 3617 has been held to apply. See, e.g., Black Jack, 508 F.2d at 1181 (holding by Eighth Circuit that zoning ordinance violated the Fair Housing Act (Title VIII) because it denied persons housing on the basis of race, in violation of § 3604(a), and interfered with the exercise of the right to equal housing, in violation of § 3617). I do not decide whether DSN could maintain claims under § 3617 for the City's conduct in allegedly imposing conditions upon, delaying the issuance of, and denying permits, or in allegedly failing to consider or grant a reasonable accommodation to DSN to operate its homes. Nor do I decide whether a § 3617 claim can be maintained with respect to provisions of the Life Safety Code that allegedly discriminate against handicapped persons.

case, I agree with the City that DSN's § 3617 "retaliation" claim, which is based on the same permissible zoning activity as the "disparate treatment" and "disparate impact" claims, necessarily fails. See Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1288 n. 5 (7th Cir. 1977) (declining to decide whether a violation of section 3617 can be established without first establishing a violation of sections 3603, 3604, 3605, or 3606, but holding that where the conduct that allegedly violated section 3617 is the same conduct that allegedly violated section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the conduct (in this case, the village's failure to rezone) violated section 3604(a)).

## CONCLUSION

The "reasonable accommodation" claim is ripe for decision. The "disparate treatment" and "disparate impact" claims can be maintained simultaneously. The definition of "family" in the City's Zoning Ordinance is not alleged to be facially discriminatory. There is no real dispute that the Zoning Ordinance's definition of "family" and group home spacing requirements are rationally related to a legitimate governmental purpose, and DSN has not demonstrated that discovery is needed regarding such matter. The court has not considered the City's late-filed evidence regarding application of the Zoning Ordinance, but such evidence will not be stricken from the court file. The City's supplemental evidence regarding the Zoning Ordinance is properly considered. Because the Zoning Ordinance does not violate § 3604, DSN cannot prove its claim that the Zoning Ordinance interferes with FHAA rights in violation of § 3617.

Accordingly,

35

IT IS ORDERED that:

1.     Plaintiff's motion to strike (filing 48) is denied.

2.     Defendant's motion for summary judgment (filing 28) is granted in part and denied in part, as follows;

      a.     The motion is granted insofar as Plaintiff has alleged in Counts I and III of its complaint that the Lincoln Municipal Code violates § 3604 or § 3617 of the FHAA, Title II of the ADA, or Section 504 of the Rehabilitation Act, and such claims are dismissed with prejudice; and

      b.     In all other respects, the motion is denied.

DATED: April 22, 2005.        BY THE COURT:

                                     s/ Richard G. Kopf
                                     United States District Judge