IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEVELOPMENTAL SERVICES OF NEBRASKA, | ) ) ) | 4:04CV3272 |
| Plaintiff, | ) ) | **MEMORANDUM AND ORDER** |
| vs. | ) ) | |
| CITY OF LINCOLN, | ) ) | |
| Defendant. | ) | |

The City of Lincoln, Nebraska, has a zoning ordinance that generally prohibits more than 3 unrelated persons from living together in a single-family dwelling or on either side of a duplex, but that specially permits state-licensed group homes for 4 or more disabled persons in all residential districts on the condition that no other group home is located within a prescribed distance (½ mile or 1,200 feet, depending upon the district). The ordinance has been applied by the City to prevent an increase (from 3 to 4) in the number of disabled persons permitted to reside at several properties operated by Developmental Services of Nebraska ("DSN").[1] DSN alleges that the City's conduct has violated the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. §§ 3601-3619, Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12165, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

---

[1] As originally filed, the lawsuit also challenged the City's application of the State Fire Marshal's Life Safety Code. DSN has since entered into a consent decree with the State Fire Marshal and withdrawn its claims against the City related to the Life Safety Code. See Memorandum and Order entered July 6, 2006 (filing 155), denying as moot the City's motion for summary judgment as against DSN's first amended complaint.

I have already held, based on Eighth Circuit and Supreme Court precedent, that the zoning ordinance's spacing requirements and definition of "family" are rationally related to a legitimate governmental purpose, and thus are not vulnerable to attack on a claim of facial discrimination. See Memorandum and Order entered April 22, 2005 (filing 58), granting in part and denying in part the City's motion for summary judgment against DSN's original complaint.[2] The issues remaining to be decided, either on summary judgment or at trial,[3] are, stated simply: (1) whether the City intentionally discriminated on the basis of disability, or retaliated against DSN, in applying the zoning ordinance to DSN's properties, and (2) whether DSN is entitled to a reasonable accommodation to the zoning ordinance for any of its properties. See Pretrial Order (filing 154), at 17-18.

## A. DSN's Properties

Over the past few years, DSN has proposed to add a fourth resident to several of its homes, but the City has refused to issue new certificates of occupancy because

---

[2] I also ruled that DSN's reasonable accommodation claim is ripe for decision notwithstanding the fact that DSN did not request the Lincoln City Council to amend the zoning ordinance, which the City maintained was the only avenue then available to DSN. Id. Since that ruling, the City has implemented a procedure for the Council to consider reasonable accommodation requests. DSN claims this new procedure is inadequate, however.

[3] A non-jury trial of this matter is scheduled to commence on February 5, 2007. See Memorandum and Order entered October 26, 2006 (filing 163). The City has moved for summary judgment on all remaining issues (filing 142), but DSN has cross-motioned for summary judgment only on its reasonable accommodation claim (filing 147). DSN's request for oral argument (filing 178) will be denied. DSN's motion for leave to file a supplemental reply brief and evidence (filing 174) will be granted instanter.

2

of the zoning ordinance's group home spacing requirement.[4]  Without the issuance of a certificate of occupancy for 4 persons, none of these homes can be licensed by the State as a center for the developmentally disabled ("CDD").  See Neb. Rev. Stat. Ann. § 71-408 (LexisNexis 2006) (defining a "center or group home for the developmentally disabled" as "a facility where shelter, food, and care, advice, counseling, diagnosis, treatment or related services are provided . . . to four or more persons residing at such facility who have developmental disabilities.").  With such licensing, the homes' residents could qualify for increased supplemental security

_____

[4] Lincoln Municipal Code Chapter 27.03, contains the following pertinent definitions:

(a) §27.03.180 defines dwelling to mean "any building or portion thereof which is designed and used for residential purposes."

(b) §27.03.190 defines single-family dwelling to mean "a dwelling having accommodations for and occupied by one family."

(c) §27.03.220 defines "family" as follows: "One or more persons immediately related by blood, marriage, or adoption and living as a single housekeeping unit in a dwelling shall constitute a family.  A family may include, in addition, not more than two persons who are unrelated for the purpose of this title.  The following persons shall be considered related for the purpose of this title:  (1) A person residing with a family for the purpose of adoption; (2) Not more than six persons under nineteen years of age, residing in a foster home licensed or approved by the State of Nebraska; (3) Not more than four persons nineteen years of age or older residing with a family for the purpose of receiving foster care licensed or approved by the state or its delegate; (4) Any person who is living with a family at the direction of a court."

(d) §27.03.300 defines "group home" as follows: "Group home shall mean a building or structure licensed or approved by the State or an appropriate agency, if required, used as any one of the following:  (a) A facility in which more than three but less than sixteen disabled persons who are unrelated by blood, marriage, or adoption reside while receiving therapy or counseling, but not nursing care; (b) A facility engaged in the service of exercising 24-hour daily care, supervision, custody, or control over more than three but less than sixteen children, for compensation or hire in lieu of the care or supervision normally exercised by parents in their own home.  (Filing 143 ("City's Brief ") ¶¶ 5, 6; Filing 148 ("DSN's Brief") ¶¶ 35, 36.)

income ("SSI") payments.[5]  Thus, by converting a 3-person, single-family dwelling into a 4-person group home, not only would DSN receive rent money from more people, but it would receive larger payments from each person.  DSN, of course, would also receive additional Medicaid payments for services provided to the new resident.  Apart from these potential financial benefits to itself,[6] DSN claims that disabled persons will benefit because there is a pent-up demand for its services, and because under a state funding formula it may be able to improve the resident-to-staff ratio (from 3:1 to 2:1) at each home by adding a fourth resident.[7]

_____

[5] In addition to state and federal funds for habilitation and training, individuals with disabilities typically receive supplemental security income to pay for room and board and personal needs.  SSI funds vary depending upon the type of facility in which the individual is placed.  For example, in 2005 the SSI rate for an individual living in a CDD was $579 per month, whereas for a person living in a certified community-based residence it was $506 per month.  (DSN's Brief ¶¶ 29, 30.)

[6] DSN is a non-profit, charitable corporation organized under Nebraska law. (City's Brief ¶ 1; DSN's Brief ¶ 1.)

[7] In the early 1990's, the State of Nebraska hired Deloitte Touche to develop a funding methodology to determine how much money should be allocated to persons with developmental disabilities to offset the cost of providing their habilitation and training.  Through the methodology, Deloitte Touche derived a standard rate of reimbursement, which was then adopted by the State.  (DSN's Brief ¶¶ 18, 19.)  The standard rate was designed to reimburse services provided to the individual, the cost of the staff for supervising that individual, administrative costs, transportation costs, training for the staff, and supplies.  However, it is only intended to cover 90 percent of these costs, and the remaining 10 percent was to be made up through County funds. The standard rate was not intended to reimburse room and board, rent, or utilities. (DSN's Brief ¶¶ 23-25.)  Each person with a developmental disability is put through an objective assessment process from which the State's Health and Human Services System ("HHSS") determines the number of intervention hours he or she should be assigned.  Each intervention hour is roughly equivalent to the number of hours of service a person with a developmental disability should receive each month.  The standard rate derived from Deloitte Touche's study is then multiplied by the number of intervention hours for a particular disabled person to determine the maximum

4

### *1.  4000 Lindsey Circle*

On December 2, 2003, DSN submitted an application to change the occupancy of 4000 Lindsey Circle from a single-family dwelling to a group home.  (City's Brief ¶ 12(f); DSN's Brief ¶ 42.)  The City denied the application on December 15, 2003, stating:  "R-1 Zoning District requires a distance to any other group home not be less than ½ mile.  4000 Lindsey Circle is approximately 1570 feet to a group home located at 3800 Northwest 50th Street."  (DSN's Brief ¶ 48; Filing 149, Ex. 9.)

On February 10, 2004, DSN's attorney, Lisa Koch, wrote to Mike Merwick, Director of the City's Department of Building and Safety, requesting a reasonable accommodation to Lincoln Municipal Code §§ 27.11.030(b)(2) and 27.15.030(b)(2) so that 4000 Lindsey Circle could receive a new certificate of occupancy and be licensed by the State as a CDD.  (City's Brief ¶ 12(j); DSN's Brief ¶ 50.)  DSN was seeking an accommodation from the separation requirement or, in the alternative, an accommodation from the definition of "family" in the Municipal Code.  (DSN's Brief ¶ 51.)  On April 12, 2004, the City's attorney, Rick Peo, replied that the City did not have the authority to administratively grant requests for reasonable accommodation from requirements of the zoning ordinance, and he advised Koch that requests must be approved by the City Council in accordance with the procedure for adopting a change of zone, which may include a text amendment. (City's Brief ¶ 12(m); DSN's Brief ¶ 52.)  On May 27, 2004, attorney Scott Moore sent a letter to Peo advising that

---

amount of money per month a service provider can be reimbursed for services provided to that person.  (DSN's Brief ¶¶ 20-22.)  HHSS has periodic audits of the service providers for persons with developmental disabilities to ensure that the providers are actually providing the services for which they seek reimbursements.  To receive reimbursement for one full-time staff member, the total number of intervention hours for the persons being served in one month must add up to at least 347 (80 hours per week multiplied by 4⅓ weeks).  Thus, to be reimbursed for two full-time staff members, the total number of intervention hours for the persons being served by that staff must add up to 694.  (DSN's Brief ¶¶ 27, 28.)

he had been retained by DSN and again requesting that the City grant DSN a certificate of occupancy. In the alternative, Moore stated he was submitting the letter and accompanying applications as a request for reasonable accommodation for consideration by the Board of Zoning Appeals ("BZA"), the Lincoln City Council, or any other city department, board or commission with the authority to grant DSN a reasonable accommodation. (City's Brief ¶ 12(p).) On June 4, 2004, Peo sent Moore a letter stating that the BZA did not have authority to grant a reasonable accommodation, and that the appropriate course of action for DSN was to request the City Council to amend the text of the zoning ordinance. (City's Brief ¶ 12(q); DSN's Brief ¶ 55.) DSN instead filed this lawsuit, on August 17, 2004. (City's Brief ¶ 12(s); DSN's Brief ¶ 56.)

On May 9, 2005, after I had ruled that DSN's reasonable accommodation claim was ripe for decision, the Lincoln City Council adopted Ordinance No. 18536 to establish a new procedure for a person with disabilities to request and receive a reasonable accommodation. (City's Brief ¶ 12(t); DSN's Brief ¶ 58.) The procedure, which appears at Chapter 1.28 of the Lincoln Municipal Code, is as follows:

> 1.28.010 Purpose.
>
> This chapter provides a procedure to request reasonable accommodation for persons with disabilities or handicaps seeking equal access to housing under the Rehabilitation Act, the Americans With Disabilities Act, the Federal Fair Housing Amendments Act and the Nebraska Fair Housing Act (the Acts) in the application of the City of Lincoln's building codes, fire or safety codes, zoning laws, and other land use regulations, policies and procedures.
>
> 1.28.020 Applicability.
>
> A request for reasonable accommodation may be made by any person with a disability or handicap, as defined in the Acts, or by an entity acting on behalf of a person or persons with disabilities or handicaps to provide or secure equal opportunity to use and enjoy a dwelling and/or otherwise receive services or participate in programs or activities provided by the City when the application of a City of Lincoln

6

building code, fire or safety code, zoning law or other land use regulation, policy or practice acts as a barrier to such equal opportunities. The provisions of this chapter do not apply to the City's Bureau of Fire Prevention's application of any code or regulation adopted by the State Fire Marshal pursuant to its delegated authority from the State Fire Marshal. As defined in the Acts, a person with a disability or handicap is a person who has a physical or mental impairment that limits or substantially limits one or more major life activities; anyone who is regarded as having such impairment; or anyone who has a record of such impairment.

A request for reasonable accommodation may include a modification or exception to rules, standards and practices when such modification or exception is necessary to eliminate regulatory barriers and provide a person with a disability or handicap with equal opportunity to use and enjoy a dwelling and/or to otherwise receive services or participate in programs or activities provided by the City. Requests for reasonable accommodation shall be made in the manner prescribed by Section 1.28.030.

1.28.030 Application Requirements.

(a) Application. Requests for reasonable accommodation shall be submitted on an application form provided by the City Clerk, or in the form of a letter to the City Clerk, and shall contain the following information:

(1) The applicant's name, address and telephone number.

(2) The street address and legal description or Assessor's Parcel Number of the property for which the request is being made.

(3) The current actual use of the property.

(4) The law, provision, regulation or policy from which reasonable accommodation is being requested.

(b) Additional Information. The following information shall be submitted with the application:

(1) A statement from the applicant describing the basis for the claim that the individual (or group of individuals, if application is made by an entity acting on behalf of a person or persons with disabilities or handicaps) is considered disabled or handicapped under the Acts.

(2) A statement as to why the requested accommodation is financially, therapeutically, or otherwise necessary to afford a handicapped or disabled person equal opportunity to use and enjoy a dwelling and/or to otherwise receive services or participate in programs provided by the City.

(3) Documentation supporting the financial, therapeutic, or other necessity for the accommodation.

Upon the filing of the application, together with all information required above, the City Council shall refer a request for reasonable accommodation from a zoning law or other land use regulation policy or practice to the Planning Commission. If the request is for reasonable accommodation from a building code, fire code, or safety code, the City Council shall refer the request to the Board of Appeals established under said code to hear appeals of orders, decisions, determinations, made by the code official relative to the application or interpretation of such code. The Planning Commission or such Board of Appeals are hereinafter referred to in this chapter as the Reviewing Authority.

1.28.040 Reviewing Authority and Procedure.

The Reviewing Authority shall hold a public hearing on the request and make a recommendation and report to the City Council within 45 days from the date of referral regarding granting, granting with modifications, or denying the request for reasonable accommodation in accordance with Section 1.28.050. Failure of the Reviewing Authority to submit its report and recommendation to the City Council within said 45 days shall be deemed to be a recommendation of approval, unless the delay is at the request of or due to the default of the applicant.

1.28.050 Decision.

Upon receiving the report from the Reviewing Authority or upon failure of the Reviewing Authority to timely submit its report, the City Council after public hearing shall take final action upon the application and may grant, grant with modifications, or deny the request for reasonable accommodation consistent with the Acts and based upon the following findings:

(1) Whether the housing which is the subject of the request will be used by an individual or a group of individuals considered disabled or handicapped under the Acts.

(2) Whether the accommodation requested is financially, therapeutically, or otherwise necessary to make specific housing available to the individual or group of individuals with a disability or handicap under the Acts.

(3) Whether there are alternative reasonable accommodations available that would provide an equivalent level of benefit.

(4) Whether alternative accommodations would be suitable based on the circumstances of this particular case.

(5) If applicable, whether the requested reasonable accommodation would be consistent with the Comprehensive Plan land use designation of the property which is the subject of the reasonable accommodation request, and with the general purpose and intent of the zoning district in which the use is located.

(6) Whether the requested reasonable accommodation substantially affects the physical attributes of the property.

(7) Whether the requested reasonable accommodation would impose an undue financial or administrative burden on the City.

(8) Whether the requested reasonable accommodation would require a fundamental alteration to the zoning, building, fire, or safety codes of the City.

In granting a request for reasonable accommodation, the City may impose any conditions of approval deemed reasonable and necessary to ensure that the reasonable accommodation would be consistent with the Acts and the findings required above.

(Filing 144-2, at 27-29). Under Chapter 1.28 of the Lincoln Municipal Code, in the best case scenario, it would take six weeks for a person with a disability or a group home provider to secure a reasonable accommodation. (DSN's Brief ¶ 59.)

On May 20, 2005, Peo sent a letter to Scott LeFevre, CEO of DSN, notifying him of the new procedure and advising that in order to process DSN's previous request for waiver of the separation requirement between group homes for the proposed group home located at 4000 Lindsey Circle, an application needed to be

9

submitted to the City Clerk. (City's Brief ¶ 12(u).) Moore sent the application directly to Peo on June 13, 2005. (City's Brief ¶ 12(v).)

On July 6, 2005, DSN's application for a reasonable accommodation for 4000 Lindsey Circle appeared on the Lincoln City-Lancaster County Planning Commission agenda and, on a 5-0 vote was unanimously recommended for approval following a public hearing on the request. (City's Brief ¶ 12(x); DSN's Brief ¶ 65.) On July 25, 2005, DSN's application for a reasonable accommodation for 4000 Lindsey Circle had public hearing before the City Council, and, on a 5-1 vote (with 1 member absent), was continued for 3 weeks in order to obtain additional information from DSN. (City's Brief ¶ 12(y); DSN's Brief ¶ 70.)

On August 3, 2005, Council member Jonathan Cook sent a letter to DSN's attorney, asking DSN the following questions:

> 1. Are you operating any homes today with only three residents which are not bound by any spacing requirements in the zoning code)? If so, what are the cost and/or revenue factors that make it infeasible in this case to operate with three residents?
> 2. Do you have a fourth person already selected for the proposed four-person group home? If not, please explain how you would know that this accommodation is necessary either therapeutically or financially if there is no particular person requesting your services at this location at this time.
> 3. Please provide a breakdown of all operating and support costs for the proposed four-person group home on a daily or monthly basis: rent, food, housekeeping, supervision, and all support services by type.
> 4. Please provide a breakdown of all the anticipated revenues for these four residents by type, and restrictions on how these funds can be used.
> 5. Please describe your efforts prior to filing this request for "reasonable accommodation" to find a residence that would meet the City's spacing requirements, and why you were unable to find a suitable location.

6. Please elaborate on your statement at the hearing that four residents would benefit more from living together than three residents. I have observed that most often, the larger the family, the more opportunity for conflict!  I'm also interested in the therapeutic value of two residents sharing a bedroom.  Wouldn't loss of privacy or space be a negative for many residents?

7. Please elaborate on your statement at the hearing that with four residents you would be able to have two staff members on site rather than one.

8. If the request for reasonable accommodation was approved, would you agree to a condition of approval requiring you to provide two staff members?  If no, why not?

9. Are you in any sort of business arrangement with any other group home provider? If so, please explain.

(DSN's Brief ¶ 71.)

On August 10, 2005, Peo received a letter from Moore addressing Cook's questions and a question that had been raised at the hearing on July 25, 2005.  (City's Brief ¶ 12(z).)  On August 15, 2005, the City Council again held a public hearing on DSN's request for a reasonable accommodation at 4000 Lindsey Circle to add a fourth resident, and voted to approve the request.  (DSN's Brief ¶¶ 76, 79.)

## 2. *2440 S.W. 18th Street*

On December 2, 2003, in conjunction with its application to change the occupancy of 4000 Lindsey Circle, DSN likewise applied to change the occupancy of 2440 S.W. 18th Street from a single-family dwelling to a group home.  (City's Brief ¶ 12(f); DSN's Brief ¶ 42.)  The City denied DSN a certificate of occupancy to operate a home for four persons with developmental disabilities at the S.W. 18th Street home on December 15, 2003, stating:  "R-3 Zoning District requires a distance to any other group home not be less than ½ mile.  2440 Southwest 18th Street is approximately 620 feet to a group home located at 2301 Southwest 19th Street." (DSN's Brief ¶ 49; Filing 149, Ex. 10.)

11

The finding that a group home was already operating within ½ mile of DSN's property was subsequently determined to be in error. (DSN's Brief ¶ 50, n.2.) On November 28, 2006, Wright renewed DSN's request for the City to issue a new certificate of occupancy that would allow DSN to operate 2440 S.W.18th Street as a 4-person group home. (Filing 176 ("DSN's Supplemental Reply") ¶ 9; Filing 177-4, at 4.) A certificate was issued on November 29, 2006, with occupancy conditioned only upon verification of smoke detectors. (DSN's Supplemental Reply ¶¶ 11, 12.) DSN agrees that the condition is appropriate because of remodeling. (Id. ¶ 17.)

### 3.  3912 South 20th Street

On November 20, 2003, DSN filed an application to change the occupancy of 3912 South 20th Street from a single family dwelling to a group home. (City's Brief ¶ 12(c); DSN's Brief ¶ 41.) The disposition of this application is unknown, and no other facts regarding this property have been provided by either party.

### 4. 5516 Hunts Drive

On July 30, 2003, Mike Merwick, the City's Director of Building and Safety, received several letters from Brian Kanter, Administrator of Active Community Treatment, Inc. ("ACT").[8]  Each letter requested the City to consider a formal application for approval of proposed group homes to be located at 5516 Hunts Drive and 416, 418, 424 and 426 North Coddington Avenue. Each letter was identical in content and contained the statement "should you decline our application based upon density restrictions or fire safety measures beyond those normally imposed on this

---

[8] DSN acquired ACT on April 8, 2005. (City's Brief ¶ 1.)

size and type of residential building, we request reasonable accommodation be made to these rules and practices." (City's Brief ¶ 11(a); DSN's Brief ¶ 43.) [9]

Like DSN, ACT requested the change of occupancy from the City in order to apply for a license from the State to operate as a CDD for four residents with developmental disabilities. (DSN's Brief ¶ 44.) On August 13, 2003, Kanter was advised that formal applications for change of occupancy and filing fees must be submitted to the City in order to process ACT's request. (City's Brief ¶ 11(b); Filing 168 ("DSN's Response") ¶ 11(b).) Kanter sent a letter to Merwick on August 13, 2003, requesting assistance on filling out the change of occupancy forms, but received no response to this request. (DSN's Response ¶ 11(b).) On November 20, 2003, Merwick received several letters from Kanter, with enclosed applications for a change of occupancy for 5516 Hunts Drive (a single-family dwelling), 416-418 North Coddington Avenue (a duplex), and 424-426 North Coddington Avenue (a duplex). The applications were reviewed for compliance with the City's building code and zoning ordinance, and were all denied in December 2003 for lack of required information. (City's Brief ¶ 11(c).)

On April 1, 2004, following a meeting with Kanter to discuss the denials, Merwick received a letter from Kanter indicating that he would be resubmitting the site and floor plans for each proposed group home. Following Kanter's resubmittals, the applications were reviewed for a second time and again denied. (City's Brief ¶ 11(d), (e).)

On April 9, 2004, Merwick sent a letter to Kanter explaining that the change of occupancy for 5516 Hunts Drive was denied on the basis of the ½ mile spacing requirement because the property "is approximately 1020 feet to a group home

_____

[9] Although DSN denies part of this paragraph in its responsive brief (filing 168), it has not referenced any controverting evidence as required by our local rule. See NECivR 56.1(b)(1).

located at 940 Parkview Lane." (City's Brief ¶ 11(f); Filing 144, Ex. C, attachment 5.) As to the Coddington Avenue properties, however, the letter stated that "staff has questions on the proposed use of these properties and needs to meet with you to clarify some issues." (Id.) Merwick met with Kanter on May 21, 2004. (City's Brief ¶ 11(g); DSN's Response ¶ 11(g).) The applications for the Coddington Avenue addresses thereafter were denied "due to a zoning requirement." [10] (DSN's Response ¶ 11(h); City's Reply ¶ 4.) On June 14, 2004, Merwick received several letters from Kanter requesting reasonable accommodation from the denials. (City's Brief ¶ 11(h); DSN's Response ¶ 11(h).) Whether any response was made to these requests has not been discussed by the parties.

On April 8, 2005, DSN acquired ACT. With the acquisition, DSN became the operator of 5516 Hunts Drive and the North Coddington Avenue duplexes. (City's Brief ¶ 11(i); DSN's Brief ¶ 45.)

On August 10, 2005, DSN submitted a formal application for a reasonable accommodation for 5516 Hunts Drive. On October 26, 2005, following a public hearing, the Lincoln City-Lancaster County Planning Commission recommended denial of the application. On November 24, 2005, following public hearing, the City Council denied the application. (City's Brief ¶ 11(j)-(l); DSN's Brief ¶¶ 80, 84, 85.)

### 5. *416-418 North Coddington Avenue*

DSN also applied for a reasonable accommodation for 416 North Coddington Avenue (one side of the duplex) on August 10, 2005, but later withdrew the request

---

[10] The quoted language is Kanter's. (Filing 144, Ex. C, attachment 4.) The Building and Safety Department's written comments state, among other things, that: "R-4 zoning district requires group homes to be separated 1,200 feet from other group homes. This would not allow all of these abutting townhouses to be converted [into group homes]." (Id., Ex. C ¶ 15 & attachment 8.)

after learning that it was not necessary. (City's Brief ¶ 11(j), (k); DSN's Brief ¶ 80.) On November 28, 2006, in conjunction with DSN's request for a new certificate of occupancy for 2440 S.W.18th Street, Wright wrote Peo requesting that a certificate of occupancy for 4 persons be issued for each side of the duplex located at 416-418 North Coddington Avenue.[11]  (DSN's Supplemental Reply ¶ 9; Filing 177, Ex. 4.) The requested certificates were issued on November 29, 2006, but were conditioned upon verification of smoke detectors.  (DSN's Supplemental Reply ¶¶ 11, 12.)  On December 20, 2006, after DSN objected to the condition, the City reissued the certificates without the condition.  (Id. ¶¶ 17-19; Filing 177, Ex. 11, 12.)

### 6. 424-426 North Coddington Avenue

The duplex at 424-426 North Coddington Avenue is located next door to the duplex at 416-418 North Coddington Avenue. DSN also submitted an application for a reasonable accommodation for 424 North Coddington Avenue (one side of the duplex) on August 10, 2005.  As in the case of the application for 5516 Hunts Drive, the Lincoln City-Lancaster County Planning Commission provided an unfavorable recommendation on October 26, 2005, and the City Council denied the application on November 24, 2005.  (City's Brief ¶ 11(j)-(l); DSN's Brief ¶¶ 80, 84, 85.)

### 7. 1661 Timber Ridge Road

One other application for a reasonable accommodation was submitted on August 10, 2005, to permit 1661 Timber Ridge Road to be operated as a 4-person group home.  Again, the outcome was the same—denial of the application was

---

[11] The parties dispute whether the City recently changed its policy regarding the use of duplexes as group homes.  DSN states that it previously understood the City's position to be that using both sides of a duplex as a group home would violate the ½ mile spacing requirement.  The City maintains that since 1999 it has interpreted the zoning ordinance to permit both sides to be used as a group home, provided that the total number of residents in the duplex does not exceed 15.

recommended by the Planning Commission on October 26, 2005, and the application was denied by the City Council on November 24, 2005.  (Id.)

Although DSN contends that a reasonable accommodation was previously requested for 1661 Timber Ridge Road, no evidence of such a request has been provided.  (DSN's Response ¶ 13(a).)  In fact, according to the City's Building and Safety Director, no application for a change of occupancy to a group home was ever submitted for this address.  (Filing 144, Ex. C, ¶ 17.)  DSN's application for a reasonable accommodation merely recites that 1661 Timber Ridge Road is located less than ½ mile from an existing group home.  (Filing 149, Ex. 19.)

## B.  DSN's Claims

As defined by the parties at the final pretrial conference, two basic claims are presented:  First, that "the City discriminated against DSN on the basis of disability" because (a) "the City denied DSN the opportunity to operate housing with four persons on the basis of disability of the proposed residents of the housing in violation of 42 U.S.C. §§ 3604(f)(1)[12] and (2)[13];  42 U.S.C. § 12132[14]; and 29 U.S.C.

---

[12] Under 42 U.S.C. § 3604(f)(1), it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of–

"(A) that buyer or renter,

"(B) a person residing in or intending to reside in that dwelling after it has been sold, rented, or made available; or

"(C) any person associated with that buyer or renter."

[13] Similarly, 42 U.S.C. § 3604(f)(2) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of–

"(A) that person;

"(B) a person residing in or intending to reside in that dwelling after it has been sold, rented, or made available; or

16

§ 794[,]" [15] and (b) "the City coerced, intimidated, threatened, or interfered with DSN's exercise or enjoyment of rights protected by 42 U.S.C. § 3601 et seq. and violated 42 U.S.C. § 3617." [16]   Second, that "the City failed to grant DSN a reasonable accommodation in violation of 42 U.S.C. §§ 3604(f)(3)(B),[17] 42 U.S.C. § 12132 and 29 U.S.C. § 794" because (a) "the City filed to make reasonable accommodation in its rules, policies, practices, or services, which may be necessary to afford DSN and the current and proposed residents of homes operated by DSN equal opportunity to use and enjoy housing in violation of 42 U.S.C. §§ 3604(f)(3)(B),"[18] and (b) "the City refused to make reasonable accommodation/

---

[14] Title II, section 202, of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

[15] Section 504 of the Rehabilitation Act provides, in part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .."  29 U.S.C. § 794.

[16] 42 U.S.C. § 3617 declares that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

[17] "Discrimination" for purposes of the Fair Housing Amendments Act includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

[18] "Discrimination" for purposes of the Fair Housing Amendments Act includes "a refusal to make reasonable accommodations in rules, policies, practices, or

17

modification in its rules, policies, practices, or services, which resulted in the City excluding DSN and the proposed residents of the housing operated by DSN from participating in and being denied the benefits of the services, programs, or activities of DSN in violation of 42 U.S.C. § 12132 and 29 U.S.C. § 794." (Pretrial Order, at 17-18.) To the extent that DSN's second amended complaint alleged other claims (e.g., disparate impact), they have been abandoned. See Anderson v. Genuine Parts Co., Inc., 128 F.3d 1267, 1271 (8th Cir. 1997) (pretrial order supersedes all previous pleadings); Fed. R. Civ. P. 16(e).

Absent direct evidence of discrimination, the McDonnell Douglas[19] burden-shifting analysis applies to disability-based claims where disparate treatment or retaliation is alleged. See Peebles v. Potter, 354 F.3d 761, 766 (8th Cir. 2004) (disparate treatment); Thompson v. Bi-State Development Agency, 463 F.3d 821, 825 (8th Cir. 2006) (retaliation). A reasonable accommodation claim, on the other hand, does not require proof of discriminatory animus, and a "modified burden-shifting analysis" is applied. Peebles, 354 F.3d at 766-67 (explaining that in a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations). Thus, although DSN has alleged that the City intentionally discriminated on the basis of disability when it "fail[ed] to consider a reasonable accommodation with regard to DSN's application to operate its homes [and] fail[ed] to grant a reasonable accommodation to DSN to operate its homes" (Filing 106 ¶¶ 41, 42), the City's motives for not granting a reasonable accommodation are immaterial—all that matters is whether DSN was entitled to a reasonable accommodation under the law.[20]

─────────────

services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

[19] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[20] While it might be a good trial strategy in some cases to show intentional discrimination in conjunction with a reasonable accommodation claim in order to

### 1. *Disparate Treatment or Retaliation*

To survive summary judgment on its disparate treatment claim, DSN must show that the City has either (1) intentionally misapplied the zoning ordinance in order to prevent four disabled persons from occupying DSN's properties or (2) knowingly failed to apply the zoning ordinance to similarly situated properties that are occupied by four or more non-disabled persons. In other words, it must provide direct or indirect evidence of discriminatory treatment.

There is no evidence that the reason given by the City for denying DSN's and ACT's applications for a change of occupancy at 4000 Lindsey Circle and 5516 Hunts Drive—namely, that such properties were located within ½ mile of existing groups homes—was untrue in any respect. Similarly, it has not been shown that the City's denial of ACT's applications to convert both duplexes on North Coddington Avenue into group homes was not justified by the spacing requirement. It appears that a mistake may have been made by the City's Building and Safety Department when DSN's application for a change of occupancy at 2440 S.W. 18th Street was denied because of the spacing requirement, but there is no proof that it was other than an honest mistake. Nor is there any reason to conclude that the City at first issued only conditional certificates of occupancy for 416-418 North Coddington Avenue (requiring smoke detector verification) because disabled persons resided in that duplex. It is not known whether DSN's application for a change of occupancy for 3912 South 20th Street was acted upon, but, in any event, there is no evidence that the spacing requirement did not require that the application be denied. Finally, it

---

recover punitive damages, in this case the City of Lincoln cannot be held liable for punitive damages. See Barnes v. Gorman, 536 U.S. 181, 191 (2002) (Congress did not authorize punitive damages under Section 504 of the Rehabilitation Act of 1973 or Title II of the ADA); Inland Mediation Bd. v. City of Pomona, 158 F. Supp. 2d 1120, 1158 (C.D.Cal. 2001) (Federal Housing Act, 42 U.S.C. § 3613(c), does not authorize punitive damages against municipality).

does not appear that an application for a change of occupancy for 1661 Timber Ridge Road was ever presented to the City.

The only evidence of discriminatory animus identified by DSN concerns the City's handling of reasonable accommodation requests during 2005. Thus, DSN argues that public comments received by the Planning Commission and City Council in connection with DSN's applications for reasonable accommodation for 5516 Hunts Drive, 1661 Timber Ridge Road, and 424 North Coddington Avenue "were marked with discriminatory sentiment directed at DSN's residents," that "neighbors of the DSN homes were concerned about . . . property values declining," that one Council member "indicated that she was concerned about residents moving out of the neighborhoods because of DSN's presence," that another Council member "indicated that she was concerned that people would respond to a high number of police calls made to DSN houses," and that one Planning Commission member stated that DSN's application was "an emotional issue" while another "was uncomfortable voting in DSN's favor." (DSN's response, at 26-27.)

As discussed above, evidence that the City's denials of these applications for reasonable accommodation were motivated by discriminatory animus is immaterial to DSN's reasonable accommodation claim. While such evidence might be relevant to the issue of whether the City also engaged in disability-based discrimination when it applied the zoning ordinance to deny, or to delay granting, DSN's applications for changes of occupancy, see Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 833-34 (8th Cir. 2000) (defendant employer's repeated denials of plaintiff's requests for reasonable accommodation tended to prove that plaintiff's earlier demotion was based on disability), it is not sufficient to establish a prima facie case of disparate treatment regarding the City's application of the zoning ordinance. For example, even though the ½ mile spacing requirement did not justify the Building and Safety Department's 2003 denial of DSN's application for a change of occupancy at 2440 S.W. 18th Street, it would be unreasonable to infer that such denial was motivated by discriminatory animus simply because members of the Planning Commission and

20

City Council allegedly made discriminatory statements in 2005 while considering DSN's applications for reasonable accommodation.  Different decision-makers and different properties were involved, and temporal proximity is lacking.

As indirect evidence of discrimination, DSN notes that the City permits more than 3 unrelated persons to live in fraternity houses at the University of Nebraska at Lincoln and in University-owned apartments.  (Filing 149, Ex. A4, Czaplewski dep. at 76-77.)  However, these student residences are not similarly situated to DSN's properties.  Fraternities and sororities are permitted uses only in R-6, R-7, and R-8 Residential Districts.  (Filing 166, Ex. A ¶ 2.)  See Lincoln Municipal Code §§ 27.21.020(h), 27.23.020(i), and 27.24.020(i).  DSN's properties are located in R-1 through R-4 Residential Districts.  Four to six persons per unit are allowed in the University-owned apartments by special permit under a community unit plan, which is larger than 10 acres.  (Filing 166, Ex. A ¶ 3.)  DSN also complains about the City granting a special permit to a health care facility that operates in a campus-type setting, but it has not shown that there is any similarity between that health care facility and any of its group homes.

Regarding alleged retaliatory conduct, DSN simply theorizes that the City Council's denials in 2005 of the requests for reasonable accommodation for 5516 Hunts Drive, 1661 Timber Ridge Road, and 424 North Coddington Avenue were motivated by the filing of this lawsuit in 2004.[21]  While it may reasonably be inferred

---

[21] DSN also argues that its earlier requests for reasonable accommodation were denied in retaliation for it filing a complaint with the United States Department of Housing and Urban Development in 2003 (Filing 168 at 57), but it has provided no evidence of such a HUD filing.  DSN also argues that the City acted in a retaliatory manner when it allegedly applied the State Fire Marshal's Life Safety Code in 2003 to revoke a certificate of occupancy for a property located at 3800/3806 N.W. 50th Street, and again in 2006 to revoke a certificate of occupancy for a property located on Jennifer Drive.  (Id. at 58-59.)  As noted previously, DSN's claims involving the City's application of the Life Safety Code are no longer part of this lawsuit.

that the City set up a procedure for handling reasonable accommodation requests in direct response to DSN's lawsuit, very soon after suffering an adverse ruling on its exhaustion-of-remedies defense, there is no causal connection between the lawsuit and the City Council's denial of DSN's applications that were submitted under the new procedure.  Temporal proximity, by itself, is not a sufficient linkage.

In summary, I find no evidence that the City intentionally discriminated or retaliated against DSN in its application of the zoning ordinance's group home spacing requirement or definition of "family".   Accordingly, the City's motion for summary judgment will be granted with respect to these claims.

## 2.  *Failure to Grant Reasonable Accommodation*

My review of the evidence leads me to conclude that there are genuine issues of material fact as to whether the City violated the law when it denied requested accommodations for 5516 Hunts Drive, 1661 Timber Ridge Road, and the North Coddington Avenue properties, and delayed granting a reasonable accommodation for 4000 Lindsey Circle.[22]  Thus, the reasonable accommodation claim will be the subject of a bench trial.

Accordingly,

IT IS ORDERED that:

1.     Plaintiff's motion to file supplemental reply brief and evidence (filing 174) is granted <u>instanter</u>.

_____

[22] I reject DSN's argument that the City, by granting DSN's 2005 application for a reasonable accommodation for 4000 Lindsey Circle, is estopped from denying that DSN was entitled to a reasonable accommodation for that property in 2003.

22

2.      Plaintiff's motion for oral argument (filing 178) is denied.

3.      Plaintiff's motion for summary judgment (filing 147) is denied.

4.      Defendant's motion for summary judgment (filing 142) is granted in part and denied in part, as follows:

    a.      The motion is granted with respect to Plaintiff's claims of disparate treatment and retaliation (Count I of Plaintiff's second amended complaint); and

    b.      In all other respects, the motion is denied.

January 25, 2007.           BY THE COURT:

                                   s/ *Richard G. Kopf*
                                   United States District Judge