THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DEVELOPMENTAL SERVICES OF NEBRASKA, | ) ) ) | 4:04CV3272 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| CITY OF LINCOLN, | ) ) | |
| Defendant. | ) | |

Evidence showing heaps of red tape, garnished with bureaucratic indifference and inconsistent and irrelevant posturing by city officials, elected and otherwise, does not make the City of Lincoln guilty of consciously intending to discriminate against people with developmental disabilities. But that evidence, and more, does prove that Lincoln denied a group home provider and its developmentally disabled clients reasonable accommodations to land-use requirements. As a result, taxpayers will have to pay the provider a lot of money for the City's violation of federal law. Sadly, by merely acting reasonably, Lincoln could have easily avoided that expensive outcome.

For the reasons set forth in the following findings of fact and conclusions of law, see Fed. R. Civ. P. 52(a),[1] I award the plaintiff $ 331,928 in damages and other relief.

## I. FINDINGS OF FACT

Several of the facts in this case are uncontroverted and will not be repeated in

---

[1] Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

their entirety here.  (See Filing 154, Pretrial Order, Section (B) ¶¶ 1-84.)  I find the critical facts to be these:

1.     Plaintiff Developmental Services of Nebraska, Inc., ("DSN") provides community-based residential treatment to children and adults with developmental disabilities, mental illnesses, and behavioral challenges to help them gain the skills, knowledge, and experience to increasingly use and benefit from the resources and settings available to all citizens in Lincoln, Nebraska.  (Filing 154, Pretrial Order, Section (B) ¶ 2.)  At all relevant times, DSN was the only Nebraska provider of these services for persons "with higher levels of needs" who are "more difficult to serve." (Id. ¶ 27.)[2]  Thus, at all relevant times, DSN was the only option in Nebraska for persons needing a high level of services, and if a person could not be served by DSN, their only other options were to get services in an institution or out-of-state.  (Trial Test. Rene Ferdinand, Roger Stortenbecker, Brian Kanter, Scott LeFevre.)

2.     Before being provided with habilitation and training services like those offered by DSN, eligible persons with developmental disabilities undergo an objective assessment process to determine his or her level of need.  Part of this process involves a determination by the Nebraska Health and Human Services System ("HHSS") of the number of "intervention hours"—which generally means the number of hours of service—the disabled individual should be assigned each month.  For DSN to receive reimbursement for one full-time staff member, the monthly total of intervention hours must be at least 347.  (Filing 154, Pretrial Order, Section (B) ¶ 23.)  A standard rate is then multiplied by the number of intervention hours to calculate the maximum amount of money per month a service provider can be

---

[2]At all relevant times, DSN was the only provider that agreed to what is called a "risk-reduction addendum" with the Nebraska Health and Human Services System ("HHSS").  A risk-reduction contract is an addendum to the standard contract used between HHSS and service providers like DSN that provide services for persons with high need levels.  (Filing 154, Pretrial Order, Section (B) ¶ 27.)

reimbursed—an amount up to 90 percent[3] of the costs to provide services, supervisory staff, administration, transportation, staff training, and supplies. This amount does not reimburse room and board expenses, rent, or utility costs, and federal funds like Medicaid are not available to pay room and board expenses. However, disabled individuals also typically receive supplemental security income ("SSI") which may be used to fund room, board, and personal needs. The amount of SSI funds a person receives varies depending upon the type of facility in which the individual has been placed, with those living in licensed centers for the developmentally disabled ("CDD") receiving a higher SSI rate than those living in certified community-based residences.[4] (Filing 154, Pretrial Order, Section (B) ¶¶ 12-25.) DSN has no clients who pay for their room and board with anything other than SSI. (Filing 205, Pl.'s Post-Trial Br. at 15 ¶ 139; Filing 206, Defs.' Reply at 2 ¶ 3.)

3. The Nebraska HHSS has a policy of serving persons with developmental disabilities in the least restrictive environment possible, preferring community-based services over institutional ones. The parties agree that a study shows that over time, developmentally disabled persons in community-based environments gain skills and become more independent, whereas those placed in institutions tend to lose skills and score lower over time. Community-based services can be provided in a CDD or in a "community-based waiver setting." A CDD is a residential facility housing four or more individuals with developmental disabilities that must be licensed as such by the Nebraska Department of Licensure and Regulations. Certified facilities housing one, two, or three developmentally disabled persons are classified as "community-based

---

[3] The remaining 10 percent is paid with county funds. (Filing 154, Pretrial Order, Section (B) ¶ 19.)

[4] The parties agree that in 2005, the SSI rate for an individual living in a CDD was $579 per month, compared to $506 per month for a person living in a certified community-based residence. (Filing 154, Pretrial Order, Section (B) ¶ 25.)

3

waiver settings."  (Filing 154, Pretrial Order, Section (B) ¶¶ 26 & 28.)

     4.     Under Chapter 27 of the City of Lincoln's Municipal Code, in order for a "group home" like those at issue in this lawsuit to operate in Lincoln, the home must abide by a separation requirement that prohibits group homes from operating within either one-quarter of a mile or one-half of a mile of an existing group home depending on the zone.  (Filing 154, Pretrial Order, Section (B) ¶ 31.)

     5.     On August 8, 2003, DSN submitted an application to the Nebraska HHSS requesting licenses to operate its homes at three addresses, including 2440 Southwest 18th Street in Lincoln, as CDDs with four residents with developmental disabilities.  On December 2, 2003, DSN submitted an application and accompanying fees for a change of occupancy[5] for this property, among others.  Between July 30, 2003, and November 20, 2003, Active Community Treatments ("ACT")—which was acquired by DSN on April 8, 2005—submitted applications and filing fees for a change of occupancy at 5516 Hunts Drive and  416, 418, and 424 North Coddington Avenue to convert the single-family residences to group homes and to increase the number of residents in each home from three to four.  ACT requested the changes of occupancy in order to apply for a license from the HHSS to operate as a CDD for four developmentally disabled residents.  (Filing 154, Pretrial Order, Section (B) ¶¶ 34-39.)

     6.     Though the City of Lincoln responded to ACT's request for change of occupancy for the Hunts and Coddington properties, the process took over two years

---

[5]As explained by Lincoln's Chief Assistant City Attorney, "DSN's proposed change of occupancy in its homes from three to four disabled persons caused the use of its homes to be reclassified from a single-family dwelling to a group home as those terms are defined in the Zoning Code.  This reclassification in turn necessitated the need for a new certificate of occupancy to be issued before the increase in occupants could occur."  (Filing 187, Def.'s Proposed Findings of Fact at 8 ¶ 40.)

and never ended in any formal approval to move forward with licensing. The parties agree that the change-of-occupancy applications followed correct procedure, and that when the applications were filed, there was no alternative route ACT and DSN could have taken to get City approval for four residents in the group homes. (Filing 154, Pretrial Order, Section (B) ¶¶ 40-41.)

7. The City denied DSN a certificate of occupancy to operate a home for four persons with developmental disabilities at 2440 Southwest 18th Street, in part, because "R-3 Zoning District requires a distance to any other group home not be less than ½ mile. 2440 Southwest 18th Street is approximately 620 feet to a group home located at 2301 Southwest 19th Street." On February 10, 2004, DSN responded to the City's denial of the request for change of occupancy for the 18th Street home by requesting that the City grant DSN a reasonable accommodation from the City's separation requirement. Subsequent communications between the City and DSN on March 25, 2004, and April 7, 2004, clarified that DSN was seeking an accommodation from the separation requirement and, in the alternative, an accommodation from the definition of "family" in the Municipal Code.[6] (Filing 154, Pretrial Order, Section (B) ¶¶ 43-45.)

8. The City advised DSN on April 12, 2004, that the City did not have authority to administratively grant DSN's requests for reasonable accommodation under the City's zoning ordinances. The City also informed DSN that the requests for reasonable accommodation must be approved by the City Council in accordance with the required procedure for adopting a change of zone, which may include a text amendment. Despite the City's advice, DSN submitted a check for filing fees and two appeals to be forwarded to the City's Board of Zoning Appeals ("BZA") to

---

[6]Section 27.03.220 of the City's Municipal Code defines "family," in part, as "not more than two persons who are unrelated." (Filing 154, Pretrial Order, Section (B) ¶ 29.)

5

consider its requests for accommodation from the separation requirement and definition of "family." (Filing 154, Pretrial Order, Section (B) ¶¶ 46-48.)

9.    On June 2, 2004, the City advised DSN that the BZA did not have authority to grant the requested accommodations and that the only way DSN would receive its requested accommodations, if at all, was to successfully amend the City's zoning ordinance. Instead of submitting an application to amend the City's zoning ordinance, DSN filed this lawsuit. (Filing 154, Pretrial Order, Section (B) ¶¶ 49-50.)

10.   After this court's April 22, 2005, decision that the City's statement that the BZA did not have the authority to grant the accommodations constituted a final denial of the accommodation requests, the City adopted Section 1.28 of the Lincoln Municipal Code, which sets forth a procedure for the City to process requests for reasonable accommodations for persons with disabilities seeking equal access to housing. (Filing 154, Pretrial Order, Section (B) ¶¶ 51-53; Ex. 2.)

11.   On August 10, 2005, DSN submitted requests under this new ordinance for accommodations from the separation requirement and to add a fourth resident with a developmental disability to the two homes it acquired from ACT at 5516 Hunts Drive and 424 North Coddington, as well as to the DSN home at 1661 Timber Ridge Road. The parties agree that the City understood DSN's submittal to be requests for reasonable accommodation for persons with disabilities, and that DSN followed all of the proper procedures in requesting the reasonable accommodations. From DSN's applications, the City Planning Department understood that DSN was asserting that it had both a financial and therapeutic necessity for the accommodations. (Filing 154, Pretrial Order, Section (B) ¶¶ 72-76.)

12.   On October 26, 2005, the Planning Commission voted to recommend to the City Council that it deny DSN's reasonable-accommodation requests for the Timber Ridge, 424 North Coddington, and Hunts properties. On November 14, 2005,

the City Council held a public hearing on DSN's requests for accommodation and, after hearing testimony, denied DSN's requests. At the hearing, the City Council heard testimony that DSN needed the requested accommodations because "of the increasing demand for residential care that DSN provides"; "the State of Nebraska has recognized . . . that residential treatment is the way to go and the best type of care"; "DSN receives monthly referrals from the Department of Health and Human Services for its programs. . . . [I]n the time that these reasonable accommodation requests have been pending, persons who need residential care have [been] turned away . . . without this accommodation, people who need care are going to be turned away"; "[i]f [DSN is] able to place people with the same needs in the same home[,] their care elevates because the staff does not have to give attention to other dissimilar impairments"; "DSN is running out of space to operate"; the State of Nebraska developed its funding methodology to reimburse providers who deliver services to the developmentally disabled "based on a platform of one staff person to four consumers in each house. . . . Specifically, that was designed so that the State . . . could enjoy the efficiencies of a one to four ratio both among the fixed and the variable costs. DSN has been operating the particular three homes with a one to three person ratio . . . despite the funding methodology and it's just gotten frankly so expensive to provide services there that we can no longer afford to do that"; "[a]ll the things [DSN must] consider in terms of the requirements for licensed homes, everything from water temperature to doorway widths to accessible bathrooms and those things, really limits the kinds of places we can go and rent"; DSN believes it "continually lose[s] money" on room and board expenses for its clients and "if [DSN] continue[s] to lose money, then we'll operate in the red, and we won't be able to pay our bills, and we'll close down. . . . [W]e do show on our income statement positive income[,] but that income is used to expand the nonprofit and expand the services that are provided to these people in the future"; and "[i]t's difficult to get landlords to rent to [DSN], quite frankly. There's some discrimination that goes on." (Ex. 31, at 1-2, 4-5, 8, 11, 23.) The Lincoln City Council also heard testimony from members of the neighborhoods at issue who did not want additional, or expanded, group homes in

7

their areas. (Ex. 31, at 14-16.)

13. It is undisputed that the City Council did not talk to any group home providers or consult any experts to understand what was therapeutically necessary for the developmentally disabled persons at issue in DSN's requests. The evidence establishes that DSN repeatedly asked City Council members whether they had any questions regarding the therapeutic need for its requested accommodations, and the City Council failed to ask any questions regarding such need. (Filing 154, Pretrial Order, Section (B) ¶¶ 77-79; Ex. 31.)

14. The parties agree that the City of Lincoln has no evidence that granting the accommodations requested by DSN would have imposed any sort of undue financial or administrative burden on the City or would have fundamentally altered the nature of the City's zoning ordinances or the nature of the City's enforcement of those ordinances. (Filing 154, Pretrial Order, Section (B) ¶¶ 77-81.)

15. At trial, evidence[7] established that DSN is limited in the number of homes it may operate in the City of Lincoln because of the high cost of housing in Lincoln, the specifications DSN looks for in finding an appropriate setting in which to provide such services, the increasing costs associated with providing such services, and the City's spacing requirement. (Trial Test. Roger Stortenbecker, Scott LeFevre, Brian Kanter.) The City failed to offer any evidence rebutting the testimony of several witnesses that DSN cannot continue to provide quality services to persons residing in three-person homes and continue to be financially viable. (Trial Test.

---

[7] I find that this case is a de novo proceeding, not an administrative review of the Lincoln City Council's actions. Thus, and as Magistrate Judge Piester has already determined in this case, I am not limited to reviewing materials considered by the Lincoln City Council. Rather, I may consider additional evidence submitted by both parties. (Filing 88, at 15 (citing Essling's Homes Plus, Inc. v. City of St. Paul, 356 F. Supp. 2d 971, 977 (D. Minn. 2004).)

Roger Stortenbecker, Scott LeFevre, Brian Kanter, Justin Gulbrandson.) Adding a fourth resident to its three-person homes will not make DSN any more money; rather, it will reduce a shortfall. (Trial Test. Scott LeFevre.)

16. Further, evidence received at trial established that DSN has had to turn away referrals it would otherwise have been able to accept had the City granted its reasonable-accommodation requests to add a fourth person to various three-person residences. (Trial Test. Brian Kanter, Rene Ferdinand.) One referral DSN ended up being able to place was 17-year-old Lisa C., who was referred to DSN on an emergency basis on January 8, 2007, after her previous service provider terminated her services. DSN temporarily placed Lisa C. at another residence, but was then able to move her to 416 North Coddington when DSN finally received a license from HHSS to operate as a CDD for four persons three days later, on January 11, 2007. Because of her age, activity level, mild retardation, psychological evaluation, and gender, the 416 North Coddington residence was the most appropriate placement for Lisa C.[8] (Trial Test. Brian Kanter.)

17. Evidence at trial also established that depending upon the number of intervention hours at its three-person homes, adding a fourth resident could increase the number of staff members at the homes, which would increase the residents' and staff's flexibility. For example, with multiple staff members, all residents in a home would not need to accompany their roommate to a doctor's appointment or on errands. (Trial Test. Brian Kanter.)

18. DSN received certificates of occupancy from the City of Lincoln for 416 and 418 North Coddington and 2440 Southwest 18th Street in December 2006 because

---

[8]Other factors used to determine a DSN client's proper placement include the availability and need of public transportation, location of work or school, the level of parental involvement and visitation, and the physical accessibility of the residence. (Trial Test. Scott LeFevre.)

9

the City's legal counsel advised the City's Department of Building and Safety that, based on counsel's personal inspection, the concerns that had been raised in the "Plan Review Comments" had been satisfied. (Trial Test. Mike Merwick; Exs. 261 & 262.)

19.     Exhibit 283 accurately depicts the damages DSN suffered due to the City of Lincoln's failure to grant DSN's requested accommodations. These damages total $331,928 in lost revenue. (Trial Test. Justin Gulbrandson[9]; Exs. 253 & 283.)

## II.  CONCLUSIONS OF LAW

DSN claims that the City failed to grant reasonable accommodations with respect to several houses[10] in which DSN provides services to people with developmental disabilities in violation of the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3604(f)(3)(B); Section 504 of the Rehabilitation Act of 1973,

---

[9]Justin Gulbrandson is the Chief Financial Officer of DSN. He is not a certified public accountant, nor does he have an accounting degree. However, he served as Director of Finance for ACT from 2002 to 2005, and has served in that same capacity for DSN since 2005. Mr. Gulbrandson provided a credible, well-reasoned, and rational basis for his calculations. The estimated damages run from April 2004 (date City advised DSN that it lacked authority to grant accommodation requests) to December 2006 (date DSN received certificates of occupancy) for the 416 & 418 North Coddington properties; from April 2004 (date City denied certificate of occupancy) to December 2006 (last date DSN had updated financial information) for the 424 North Coddington and 5516 Hunts Drive properties; from September 2005 (one month after DSN submitted new accommodation requests under new ordinance) to December 2006 (last date DSN had updated financial information) for the 1661 Timber Ridge property; and from December 2003 (date City denied certificate of occupancy) to December 2006 (date DSN received certificate of occupancy) for the 2440 Southwest 18th Street property.

[10]Specifically, DSN claims the City failed to grant reasonable accommodations at 416, 418, and 424 North Coddington Avenue; 5516 Hunts Drive; 1661 Timber Ridge Road; and 2440 Southwest 18th Street in Lincoln, Nebraska.

29 U.S.C. § 794; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.[11]  DSN requests $331,928 in damages caused by the City's failure to grant such accommodations.[12]

The FHAA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap . . . ." 42 U.S.C. § 3604(f)(1). "Discrimination" under the FHAA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794. Similarly, the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

---

[11]The Pretrial Conference Order indicates the parties' agreement that the FHA, the Rehabilitation Act, and the ADA apply to this claim. Further, the parties agree that DSN is an "aggrieved person" as defined by 42 U.S.C. § 3602(i); the City is a "public entity" within the meaning of 42 U.S.C. § 12131(1); the City is a "program" or "activity" within the meaning of 42 U.S.C. § 12131(2); and the City is a "program or activity" receiving federal financial assistance within the meaning of 29 U.S.C. § 794.  (Filing 154 ¶¶ (B)(3), (B)(5), (B)(6), (C)(2).)

[12]I previously granted summary judgment in favor of the defendant City of Lincoln on Plaintiff's claims of disparate treatment and retaliation.  (Filing 184.) Developmental Svs. of Nebraska v. City of Lincoln, No. 4:04CV3272, 2007 WL 258307 (D. Neb. Jan. 25, 2007).

"All three [of these] statutory schemes embrace the concept that, in certain instances, the policies and practices of covered entities must be modified to accommodate the needs of the disabled." Wisconsin Comm. Svs., Inc. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir. 2006) (en banc). Further, because courts have found that the requirements for a "reasonable accommodation" are the same under the FHAA, ADA, and the Rehabilitation Act, I may consider all of Plaintiff's claims as one. Oconomowoc Residential Prog. v. City of Milwaukee, 300 F.3d 775, 783 (7th Cir. 2002) (citing cases); New Hope Fellowship, Inc. v. City of Omaha, 2005 WL 3508407, at *7 (D. Neb. Dec. 22, 2005). See also Allison v. Department of Corrections, 94 F.3d 494, 497 (8th Cir. 1996) (ADA and Rehabilitation Act share same standards and definitions).

In resolving the parties' previous motions for summary judgment, I stated that "[a] reasonable accommodation claim . . . does not require proof of discriminatory animus, and a 'modified burden-shifting analysis' is applied. . . . [T]he City's motives for not granting a reasonable accommodation are immaterial—all that matters is whether DSN was entitled to a reasonable accommodation under the law." Developmental Servs. of Nebraska v. City of Lincoln, 2007 WL 258307, at *9 (D. Neb. Jan. 25, 2007) (citing Peebles v. Potter, 354 F.3d 761 (8th Cir. 2004)). Specifically, the plaintiff has the burden to "show that the requested accommodation is 'reasonable upon its face, *i.e.*, ordinarily or in the run of cases.' Upon such a showing, the [defendant] is left to 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" Peebles, 354 F.3d at 768 (internal citations omitted) (quoting U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)).

In the housing context, a "reasonable accommodation" is one that is "necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Oconomowoc, 300 F.3d at 784 (three key elements of reasonable accommodation claim under FHAA and ADA are reasonableness, necessity, and

equal opportunity); New Hope Fellowship, 2005 WL 3508407, at *7 (accommodation is reasonable if necessary to afford handicapped person equal opportunity to use and enjoy dwelling); Essling's Homes Plus, Inc. v. City of Saint Paul, 356 F. Supp. 2d 971, 980 (D. Minn. 2004) (same). The reasonableness inquiry is "highly fact-specific," "requires balancing the needs of the parties," and involves assessing "both financial and administrative costs and burdens." Oconomowoc, 300 F.3d at 784. An accommodation is reasonable "if it is both efficacious and proportional to the costs to implement it." Id.

An accommodation is "necessary" if it will "affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." Id. (internal quotation marks and citation omitted). "In other words, the plaintiffs must show that without the required accommodation they will be denied the equal opportunity to live in a residential neighborhood." Id. See also New Hope Fellowship, 2005 WL 3508407, at *7.

"Equal opportunity" means "the opportunity to choose to live in a residential neighborhood." Oconomowoc, 300 F.3d at 784. Under the FHAA, local governments cannot apply land-use regulations "'in a manner that will . . . give disabled people less opportunity to live in certain neighborhoods than people without disabilities.'" Id. (quoting Smith & Lee Assoc. v. City of Taylor, Michigan, 102 F.3d 781, 795 (6th Cir. 1996)). "When a zoning authority refuses to reasonably accommodate . . . small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice." Oconomowoc, 300 F.3d at 784.

> The "equal opportunity" element limits the accommodation duty so that not every rule that creates a general inconvenience or expense to the disabled needs to be modified. Instead, the statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the

13

> housing market. We have enforced this limitation by asking whether the rule in question, if left unmodified, hurts "handicapped people *by reason of their handicap*, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing." *See Hemisphere Bldg. Co., Inc. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (emphasis in original).

Wisconsin Comm. Svs., Inc., 465 F.3d 737 at 749.

## A.  Plaintiff's Showing

DSN has presented evidence establishing a direct linkage between the requested accommodation of adding a fourth resident to the properties at issue to the "equal opportunity" of DSN's current and potential residents to use and enjoy a dwelling of their choice on the same basis as others. Specifically, DSN established that its request to add a fourth resident to its homes was necessary because: (1) people with developmental disabilities, including individuals with higher needs whom DSN serves pursuant to the risk-reduction addendum, have gone and will go without community-based residential treatment (the type of treatment preferred by the Nebraska HHSS and providers like DSN) in the City of Lincoln unless the accommodation is granted; (2) DSN is limited in the number of homes it may operate in the City of Lincoln because of the high cost of housing in Lincoln, the specifications DSN looks for in finding an appropriate setting in which to provide such services, the increasing costs associated with providing such services, and the City's spacing requirement; (3) people DSN currently serves in the homes at issue will directly benefit from the accommodation because adding a fourth resident will allow DSN to increase staffing and the current residents will receive additional oversight by Nebraska HHSS as a result of residing in a CDD; (4) each resident will receive a higher SSI benefit by receiving care in a CDD, and that additional income will directly benefit the home in which they live; and (5) if the accommodation is not granted, DSN may be financially unable to continue providing high-quality services.

I conclude that the plaintiffs have made a sufficient showing that the accommodation at issue is "reasonable and necessary to provide them with an equal opportunity to enjoy housing in a residential community" of their choice. The burden then shifts to the City of Lincoln "to prove either that the accommodation was unreasonable or that it created an undue hardship." Oconomowoc, 300 F.3d at 787.

## B. Defendant's Showing

An accommodation is unreasonable if "it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." Oconomowoc, 300 F.3d at 784; Essling's Homes Plus, 356 F. Supp. 2d at 979; New Hope Fellowship, 2005 WL 3508407, at *7.

> [I]n undertaking this highly fact-specific assessment, it is necessary that the court take into consideration *all* of the costs to *both* parties. Some of these costs may be objective and easily ascertainable. Others may be more subjective and require that the court demonstrate a good deal of wisdom in appreciating the intangible but very real human costs associated with the disability in question. On the other side of the equation, some governmental costs associated with the specific program at issue may be a matter of simply looking at a balance sheet. Others, however, may be those intangible values of community life that are very important if that community is to thrive and is to address the needs of its citizenry.

Wisconsin Comm. Svs., Inc., 465 F.3d 737 at 752 (emphasis in original).

Somewhat amazingly—and as stated in the Pretrial Order in this case—the City of Lincoln admits that it has no evidence that granting the accommodations requested by DSN would have imposed any sort of undue financial or administrative burden on the City or would have fundamentally altered the nature of the City's zoning ordinances or the nature of the City's enforcement of those ordinances. (Filing 154,

15

Pretrial Order, Section (B) ¶¶ 77-81.) Thus, by its own admission, the City of Lincoln has failed to prove either that the accommodations requested by DSN were unreasonable or that they created any sort of undue hardship.

> In case after case, courts have concluded that the FHA has been violated where municipalities have attempted to prevent or restrict persons with disabilities from living in the single family-zoned homes of their choice, even when the number of residents exceeds the number of unrelated people permitted to live together under the applicable zoning ordinances.

Dr. Gertrude A. Barber Center, Inc. v. Peters Township, 273 F. Supp. 2d 643, 651 (W.D. Pa. 2003) (citing cases) (holding that accommodation of permitting four, as opposed to three, unrelated people with mental retardation to live in single-family-zoned neighborhood of their choice was necessary).

Further, I reject the City's oft-repeated argument that DSN can simply "open[] up another three-person home" instead of "filling an empty bedroom" in an existing home. (Filing 204, Def.'s Post-Trial Br. at 40.) The City reasons that while this option "may be more expensive," DSN has "failed to show that opening a new home is financially infeasible." (Id.; see also id. at 44 (real reason for DSN's requests is to avoid expense of opening up new home), 47 (DSN failed to offer proof at trial that cost to open new three-person home is prohibitive), 53 (DSN's financial evidence shows DSN can continue to operate its homes with three persons), 59 (nothing in record suggests that a house occupied by four disabled persons, as opposed to three, is necessary to accommodate disabled individuals), 62 (needs of DSN's clients can be properly treated "whether or not these individuals live in groups of three or in groups of four"), 65 ("the evidence shows that DSN provides a house of three disabled residents with meaningful therapeutic benefits").)

The City's assertion that the specific homes DSN wishes to expand to four

occupants would not ameliorate the residents' disabilities any more than some other three-person location does not make DSN's accommodation requests unnecessary.

> If the City's interpretation of the reasonable accommodation test were the rule, it is doubtful that any group home ever could prevail on a FHAA claim, because there will always be some other parcel of property upon which a comparable residence could be established. Under the City's logic, a city could always prevail by showing that there were other locations available for the home to locate somewhere in the city. However, the FHAA does not only outlaw discrimination in the denial of all housing; it outlaws discrimination in the denial of <u>particular dwellings</u>.

<u>United States v. City of Chicago Heights</u>, 161 F. Supp. 2d 819, 836 & 841 (N.D. Ill. 2001) (Seventh Circuit has supported interpretation that FHAA protects disabled persons' right to live in dwelling of their choice, not some alternative property within the community) (emphasis added). <u>See also</u> <u>Dr. Gertrude A. Barber Center</u>, 273 F. Supp. 2d at 654 ("Repeatedly, the federal courts have held that the FHA protects the right to live in the particular dwelling chosen by the residents, or by the agency providing such housing.") (citing cases).

## **C. Conclusion**

I conclude that the DSN's proposed accommodation of adding a fourth resident to its group homes at 416, 418, and 424 North Coddington Avenue; 5516 Hunts Drive; 1661 Timber Ridge Road; and 2440 Southwest 18th Street in Lincoln, Nebraska, is both necessary to ameliorate its clients' disabilities and reasonable because—by the City's own admission—the accommodation will neither fundamentally alter the City of Lincoln's zoning scheme, nor cause the City undue financial or administrative burdens. Thus, the City's failure to grant DSN's proposed accommodation constituted an act of discrimination within the meaning of the Fair Housing Amendments Act, the Rehabilitation Act of 1973, and the Americans with

Disabilities Act, and judgment should be entered in favor of DSN and against the City of Lincoln.

Because "[t]he prevailing party in FHA litigation may be awarded costs and a reasonable attorney's fee" under 42 U.S.C. § 3613(c)(2), I shall grant DSN time to file an application for such fees. Oxford House-A v. City of University City, 87 F.3d 1022, 1024 (8th Cir. 1996).

IT IS ORDERED:

1. Judgment shall be entered by separate document in favor of plaintiff Developmental Services of Nebraska and against the City of Lincoln in the amount of $331,928, but entry of final judgment shall be withheld until resolution of any application for attorney fees;

2. Plaintiff may file an application for attorney fees pursuant to NECivR 54.3 and 54.4 on or before May 22, 2007, and any response to such attorney fee application shall be filed on or before June 6, 2007.

May 2, 2007.

                                                                     BY THE COURT:
                                                                     s/ *Richard G. Kopf*
                                                                     United States District Judge